[L. A. No. 24587. In Bank. Feb. 9, 1960.]

MAUDE P. BREWER et al., Plaintiffs and Appellants, v. ABIGAIL PARKHURST SIMPSON et al., Defendants and Appellants.

Edmond Gattone and Clifford A. Hemmerling for Plaintiffs and Appellants.

George I. Devor, Paul P. Selvin, Irving M. Walker, Mark Mullin and Robert A. Schlesinger for Defendants and Appellants.

SCHAUER, J.—Plaintiffs and defendants by cross-appeals attack a judgment which awards plaintiffs some but not all of the relief sought in an action for specific performance of a contract to make mutual wills, to declare a trust, and for an accounting. Defendant Abigail Simpson and her former husband George Brown made mutual wills which provided that all the property of the first to die should go to the survivor and all the property of the survivor should go one half to named relatives of George (not parties to this action) and one half to named relatives of Abigail (plaintiffs here). George died and Abigail took under his mutual will. She married defendant E. Ross Simpson and transferred all her property to herself and Ross in joint tenancy. Plaintiffs then brought this action.

The trial court found, among other things, that there was and is an enforceable oral agreement between Abigail and George that they would make the mutual wills and "that neither George nor Abigail could, after the death of the other, change the . . . named beneficiaries or in any way deprive them of the benefits of said agreement; . . . the survivor could have during his or her lifetime the reasonable use and enjoyment of their combined estates . . ." To effect the agreement the judgment impresses a trust for plaintiffs' benefit on all property owned by Abigail, or by Abigail and her present husband Ross in joint tenancy, on the date of conclusion of trial; it provides that for the duration of the trust neither Abigail nor Ross can deal with trust property so as to obstruct plaintiffs' rights; and it sets forth formulae for computing the share of the trust property which plaintiffs shall receive on Abigail's death, either if she predeceases Ross or if he predeceases her.

Abigail and Ross (hereinafter sometimes called defendants[1]) contend that the evidence does not support essential findings, that there are irreconcilable conflicts in material

---

[1]Ellis P. Brewer, a grandnephew of Abigail, refused to be a plaintiff, is joined as a defendant, and does not appear on appeal. References to "defendants" in this opinion include only Abigail and Ross, not Ellis P. Brewer.

findings, and that, assuming arguendo that the judgment is otherwise proper, it erroneously bases its calculation of plaintiffs' interests on the value of the estate at Abigail's death rather than at George's death. Plaintiffs complain that the judgment does not require defendants to restore to the trust estate (a) sums expended by defendants from such estate in their unsuccessful attempts to defeat the trust and (b) the value of gifts made by Abigail from such estate to Ross and his parents; that under the formulae of the judgment plaintiffs will receive less than their proper share as remaindermen beneficiaries of the trust; and that defendants should be compelled to render an accounting to plaintiffs. We have concluded that the evidence supports the essential findings, the findings support the judgment, and the methods of computation of plaintiffs' share of the trust estate are proper.

In the following summary of the findings pertinent to this appeal, capital Roman numerals are the numbers by which the trial court designated its findings; small bracketed Roman numerals, inserted for convenience of subsequent reference, designate those portions of the findings which are attacked as unsupported by the evidence.

## I

Abigail, then a widow, and George intermarried in 1910. No children were born to or adopted by either Abigail or George. When they married "each owned substantial separate property" and [i] "George's property was . . . of substantially greater value than Abigail's [ii] Property acquired by them subsequent to their marriage was community property even though various portions were held in their separate names or in joint tenancy for convenience only."

## II

[iii] "Prior to July 21, 1936, Abigail and George orally agreed to make mutual wills wherein the entire estate of each party would be bequeathed and devised to the other, and the entire combined estate of the survivor would be bequeathed and devised" one half to named relatives of George in designated shares and one half to named relatives of Abigail in designated shares.

"Abigail and George also agreed that: (1) their mutual wills would contain the provisions included in the mutual wills subsequently executed by them as set forth below; (2) the agreement for the making of mutual wills was intended

and made for the express benefit of all of the persons named therein as beneficiaries without distinction as to whether said beneficiaries were the kindred of George or Abigail; . . . that neither George nor Abigail could, after the death of the other, change the aforementioned named beneficiaries or in any way deprive them of the benefits of said agreement; (3) the survivor could have during his or her lifetime the reasonable use and enjoyment of their combined estates; and (4) that upon the death of the survivor they both desired the property to pass to the persons named . . . as beneficiaries . . . as stated in the mutual wills and not otherwise.''

### III, VII

Abigail and George on July 21, 1936, concurrently executed mutual wills [iv] which ''conformed in all respects to the terms . . . of said agreement . . .''

### IV

The pertinent provisions of Abigail's will of July 21, 1936, are as follows:

''I, Abigail Parkhurst Brown, being of sound and deposing [sic] mind and memory and not acting under fraud, duress or undue influence of any person, do make, publish and declare this my Last Will and Testament, and I do hereby further declare that this Last Will and Testament is made in consideration of a mutual Will on the part of my husband, George Stanley Brown, of even date herewith and in pursuance to an agreement between myself and my said husband . . . for the making of these mutual Wills on the part of each of us, and it is understood that should I be the survivor as between myself and my said husband and should I deem it advisable to appoint other executors in the place of those named herein, I reserve the right to do so and my said husband shall have the like privilege so long as one of the coexecutors is appointed from my family and one from the family of my said husband . . .

''In the event my said husband . . . shall survive me, I hereby give . . . to my husband . . . all of my estate . . .

''If my husband . . . be deceased at the time of my demise then . . . I hereby give . . . my entire estate including any and all property or estate that I may have received from my said husband one-half (½) to my kindred and one-half (½) to the kindred of my said husband, as hereinafter directed. [There follow gifts in designated shares to named relatives.] . . .''

The provisions of George's will are identical or, in appropriate part, reciprocal.

## V, VIII

With the consent and knowledge of one another, Abigail and George on October 27, 1936, concurrently executed codicils [v] which "conformed in all respects to the terms . . . of said agreement for the making of mutual wills as modified . . ."

## VI

The codicils changed a trust provision of the will because of a change of circumstance of the beneficiary of such trust, Abigail's sister, and provided, "All other terms and conditions of my said Last Will and Testament to remain as originally written."

## IX

Abigail was about 67 years old and George was about 72 when they executed their wills.

## X

[vi] "The wills of George and Abigail constitute a true written memorandum of said oral agreement for the making of mutual wills . . ."

## XI

[vii] "At the time the oral agreement to make mutual wills was made and during the negotiations leading to the same, and at the time the wills and codicils were executed and during the drafting thereof, Abigail and George were each represented and fully and independently advised by Ralph E. Wallace and William M. Crandall, attorneys at law. Said mutual wills and codicils were . . . voluntarily executed . . . by both Abigail and George, in each other's presence and with full knowledge and understanding of the contents and consequences thereof. At said times, Abigail was not in any respect imposed upon."

## XII

During George's life the mutual wills were not changed except by the above described codicils, and the wills and codicils were not revoked. [viii] "Relying on the relationship of trust and confidence which existed between them, and further relying on Abigail's promised performance and her conduct as aforesaid, George, with Abigail's full knowledge, agreement and consent, did not revoke his will and codicil and died leaving the same in full force . . . with the belief, understanding and expectation that Abigail's mutual will and codicil

was and would continue to be in full force . . . and would become fully operative at her death, and that she would hold their combined estates for the uses and purposes declared by said agreement . . . and by said mutual wills . . ."

## XIII

[ix] "[T]he agreement for the making of mutual wills, and the mutual wills and codicils made pursuant thereto, were at all times fair, just and equitable as to both Abigail and George."

## XIV

George died on March 31, 1937. On petition of Abigail his will and codicil were admitted to probate on May 3, 1937. Abigail was appointed and qualified as executrix.

## XV

The property standing in George's name was appraised at a value in excess of $80,000 during probate. All his estate was distributed to Abigail by decree of distribution recorded on December 21, 1937. Also Abigail became the owner of George's interest in [x] those portions of their community property which had been of record for convenience in joint tenancy or in her name.

## XVI

After George's death Abigail retained Messrs. Wallace and Crandall to act as attorneys for her as proponent and executrix of George's will [xi] and "as attorneys for her personally . . . Her conduct in offering George's will for probate and in accepting benefits thereunder was free, voluntary and with full knowledge and understanding of the terms of said agreement, wills and codicils, and was not under any undue influence, mistake or fraud. Abigail elected to take under George's will and to abide by the terms of their agreement and after George's death ratified and affirmed the same."

## XVII

After the probate of George's estate, Abigail obtained from Wallace and Crandall their only office copies of her will and codicil. She did not return such papers to the attorneys and did not produce in court the original or a copy of her will or codicil. [xii] She kept the originals from the time of their execution, and has not accounted for her failure to produce them or copies of them in court. "She has concealed or destroyed said will and codicil with the intent of making the same inoperative . . ."

## XIX

On February 7, 1945, Ross and Abigail intermarried. He was then not more than 49 years old and she was not less than 75. Prior to their marriage "there had been substantial business dealings between them, and Ross had knowledge of the size, extent and value of Abigail's estate. [xiii] Both prior to their marriage and also . . . at the time of the transfers referred to in paragraphs XXI and XXII [*infra*], Abigail had come to believe from her conversations and dealings with Ross that his estate was equal . . . to the estate then owned by Abigail."

## XX

Ross and Abigail orally agreed to "merge" their estates by transferring title to their respective properties to themselves as joint tenants. [xiv] Prior to their marriage Ross "knew and had notice of the agreement between George and Abigail for the making of mutual wills, of the mutual wills made by them, of the probate of George's will and of the distribution of George's estate to Abigail," and one purpose of Ross's and Abigail's "merger" of their properties was to evade Abigail's duties under her agreement with George and her mutual will.

## XXI

In March and April, 1945, Ross obtained from Abigail transfers and conveyances to herself and Ross as joint tenants of almost all her property.

## XXII

In March, 1945, Ross transferred to Abigail and himself as joint tenants only a part of his property. [xv] Ross did not disclose to Abigail the value of the property then transferred by him, but represented to her and she reasonably believed that he was transferring all his property. (Attacked finding [xv] is of little importance, since neither plaintiffs nor defendants attack finding XXIV, *infra*, as to the respective values of the properties of Ross and Abigail, and it is clear from the memorandum opinion and the judgment of the trial court that it determined that Ross contributed about 26 per cent of the "merged" properties.)

## XXIV

When Abigail transferred her property into joint tenancy with Ross, Ross's entire estate had a value not in excess of $90,000; Abigail's estate which she transferred into joint tenancy had a value of at least $255,000; and Ross's estate had

a value of not more than 26 per cent of the combined value of their entire estates.

## XXVI

[xvi] For "a considerable period of time" prior to Abigail's transfers of her property to Ross he was her confidential adviser, entrusted with management and control of her property and affairs. In making the transfers she had no independent advice.

## XXVII

In October, 1948, George's kindred named as beneficiaries of the mutual wills began a proceeding to perpetuate testimony of Ross, Abigail, and Crandall in contemplation of a proposed action to determine the rights of such kindred under an asserted contract of Abigail and George to make mutual wills. (See *Brown* v. *Superior Court* (1949), 34 Cal.2d 559 [212 P.2d 878].) On July 18, 1950, Abigail and Ross compromised the claims of the Brown relatives for $27,000. This sum and $13,000 costs and fees expended in the proceedings brought by the Brown relatives were paid from the "merged" estates of Abigail and Ross.

## XXVIII

During their marriage Abigail and Ross gave plaintiffs bonds having a cash value of $7,000 and gave Ross's parents real estate having a value of $10,500. Prior to their marriage Abigail made a gift to Ross of about $5,650 by cancelling a debt and encumbrance which she had against one of his properties.

## XXIX

From 1937 to 1953 Abigail devoted her time, talent, effort, and money, with some assistance from Ross, to making the property on which the trust is imposed more valuable.

## XXX, XXXII

"At all times during the marriage to George, Abigail had complete trust, faith and confidence in him and at all times during such marriage she signed such papers and documents as George requested her to sign."

## XXXIII

[xvii] "Ross and Abigail concealed from plaintiffs . . . the fact that they had repudiated . . . Abigail's obligations to plaintiffs . . . and did not give plaintiffs . . . notice of said repudiation until issue was joined in this action. . . . [A]fter the aforesaid settlement with the kindred of George, and

during defendants' last visit with plaintiff, Maude P. Brewer, in Iowa, both Ross and Abigail acknowledged and affirmed Abigail's obligations to plaintiffs . . . and led plaintiffs to reasonably believe that they intended to fully perform all of Abigail's obligations to plaintiffs under said agreement with George and the mutual wills . . ."

Findings that allegations of affirmative defenses are untrue include findings that:

[xviii] Plaintiffs were not guilty of laches.

[xix] Plaintiffs' claim is not "barred" by the statute of frauds (Civ. Code, § 1624, subd. 6, and Code Civ. Proc., § 1973, subd. 6: "an agreement . . . to make any provision for any person by will").

[xx] The alleged oral agreement is not against public policy; its enforcement would not violate the rights of Ross or Abigail under their marriage contract and would not be harsh and inequitable as to Ross or Abigail.

[xxi] Abigail's will was not revoked by operation of law upon her marriage to Ross.

Our consideration of the attacked findings (indicated, as stated, by small Roman numerals in brackets) is governed by the following rules: ▮▮ "When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact," and "When two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court." (*Grainger* v. *Antoyan* (1957), 48 Cal.2d 805, 807 [1, 2] [313 P.2d 848].) ▮ "Appellate courts . . . if there be any reasonable doubt as to the sufficiency of the evidence to sustain a finding, should resolve that doubt in favor of the finding; and in searching the record and exploring the inferences which may arise from what is found there, to discover whether such doubt or conflict exists, the court should be realistic and practical." (*Estate of Bristol* (1943), 23 Cal.2d 221, 223-224 [3] [143 P.2d 689].) ▮ But where there are material, inconsistent findings upon substantially conflicting evidence, an appellate court must reverse; it is not appropriate for it to assume to strike one determination or the other in order to uphold the judgment. (*Spaulding* v. *Cameron* (1952), 38 Cal.2d 265, 270 [239 P.2d 625].)

However, "it is only when a judgment rests upon some particular finding for its validity and support that the lack of sufficient evidence to support such finding, or the contradictoriness between two findings, treating of the same essential matter, will necessitate a reversal of the case. . . .

[H]owever lame, however inconclusive, any number of the findings may be, if in any case there be one clear, sustained and sufficient finding upon which the judgment may rest, every presumption being in favor of the judgment, it will be here concluded that the court did rest its judgment upon that finding, or those findings, and the others may and will be disregarded." (*American National Bank* v. *Donnellan* (1915), 170 Cal. 9, 15 [148 P. 188, Ann.Cas. 1917C 744].)

Defendants urge that the evidence does not support finding I [i]—that at the time George and Abigail intermarried his property was "of substantially greater value" than hers—and findings I [ii] and XV [x]—that all property acquired by them during their marriage was community property. And, defendants argue, if those findings are unsupported then finding XIII [ix]—that the agreement and the wills made pursuant thereto were fair to Abigail—cannot stand.

There is no direct evidence that property which was acquired by George and Abigail during their marriage and which stood in their separate names was community. (See the presumption that such property placed in Abigail's name was separate; Civ. Code, § 164, as amended Stats. 1923, ch. 360, p. 746, Stats. 1927, ch. 487, p. 826.) But the record as a whole would support a finding that all property acquired by George and Abigail during their marriage was community in character, for its only disclosed source (aside from the separate properties brought to the marriage by the spouses in 1910, hereinafter discussed) was the work and talent of George during the approximately 27 years of marriage. Abigail testified that until 1921 George worked for a salary and that "He resigned in 1921, and he didn't work for anybody after that, only himself. . . . [H]e was interested in trust deeds and real estate." The obvious principal source of the substantial amount of property owned by Abigail and George when he died in 1937 was his active and successful "interest" in trust deeds and real estate.

Abigail further testified that she and George each had some property when they intermarried, but she did not testify to the total value and extent of her property, and did not know the extent of George's property, at that time. There-

fore, finding I [i] must fall. Such finding, however, is not necessary to uphold the further finding of fairness of the agreement and mutual wills of George and Abigail. The unidentified separate properties brought to the marriage by each in 1910, whatever their respective values, became indistinguishable parts of the mass of properties owned by them in 1936, when they made the attacked agreement and wills, and Abigail could not trace any particular piece of 1910 property, or any computable share of such properties, as having its origin in separate property. (See *Grolemund* v. *Cafferata* (1941), 17 Cal.2d 679, 683 [1] [111 P.2d 641].)

Whatever may have been the former understanding of George and Abigail as to the character of the properties which stood in their names in 1936, their oral agreement and the mutual wills of that year evidenced an understanding that they would treat the whole as property in which their interests were "present, existing and equal interests under the management and control of the husband" (Civ. Code, § 161a), i.e., community property. Certainly there is nothing unfair to the wife in the simple fact of an agreement that thus deals with properties which either originated in the husband's efforts during marriage or, if they were separate in origin in 1910, had become indistinguishably confused over the years with property acquired by the husband's efforts during marriage and had been cared for and increased by such efforts.

The following evidence relates to the attacked finding (II [iii]) that George and Abigail orally agreed that they would make mutual wills for the express benefit of the persons named as beneficiaries, that the survivor would not change the beneficiaries or deprive them of the benefits of the agreement, and that the survivor during his or her life could have "the reasonable [inferentially, not the unlimited] use and enjoyment of their combined estates"; the findings (III, VII [iv], V, VIII [v]) that the wills and codicils conformed to the oral agreement and (X [vi]) that the wills "constitute a true written memorandum of said oral agreement"; and the findings (XI [viii]) that Abigail and George were independently represented and advised by Messrs. Wallace and Crandall and that Abigail executed her will and codicil voluntarily and with understanding of its consequences and was not imposed upon:

Mr. Wallace testified as follows: In the early 1930's George employed Wallace and Crandall as his attorneys in connection with real estate transactions. Abigail "was in the office with her husband, George . . ., on two or more occasions prior to

the discussion with reference to the will'' but prior to such discussion she did not consult Mr. Wallace professionally.

Abigail and George came into the office ''a week or two before July 21, 1936.'' Mr. Wallace was then ''acting in a professional capacity as a lawyer, and seeing Mr. and Mrs. Brown as clients.'' ''I [Wallace] believe it was George who opened the conversation by saying that he wanted me to prepare wills for them, and gave me the memorandum of the legatees on both sides of the family, and told me that they had agreed on a general plan, that . . . whichever one died first, they thought that there should be no division of their property for distribution outside of the couple, that the survivor should have the money and property and the use of it for the life of the survivor, and that at the death of the survivor they wanted it to go to the designated heirs on this memorandum. . . .'' Other provisions of the wills, not here material, were discussed ''at this conversation or at [a further conversation] one or two days later . . .

''And I believe I also told them at the time that these wills could be changed by mutual consent during the lifetime of both of them, and could be changed by the survivor after the death of one of them only as to the appointment of executors or executrixes . . . I pointed that out to them, that it was binding and conclusive upon the survivor following the death of the first of them.

''After the explanation that I gave them of these various provisions, I asked them if that was what they wanted, and they said they did, that was it. So I then prepared the wills in their final form and notified them, and they came in on the 21st, at which time they were executed.''

On July 21, 1936, Mr. Wallace testified, ''I read one of them [the mutual wills] aloud . . . I gave Mr. Brown a copy of his will and Mrs. Brown a copy of her will. Then as I read . . . I asked them to follow me, and if there was anything . . . they wanted to ask or . . . suggest, to interrupt me, and they were gone through that way completely.'' Three copies of the wills had been prepared and ''Following the execution . . . I handed the original and one copy to each of the parties, and retained the third copy in our files.''

Particularly asked whether Abigail said anything ''during these conversations,'' Mr. Wallace testified, ''When the draft was gone over, I remember asking each of them if that was what they wanted, and they both told me yes . . . I asked Mrs. Brown about the group of persons in her family that

were named as legatees, and she told me about them. And at the time of the going over the wills, when I read it aloud, I think . . . I hesitated several times and asked if they were following me, to which they both said yes, they were. . . .

"I said, 'You understand then that there is a reservation there that you can change the executor that is provided in the will?' and they said yes, they understood that, and they wanted it that way. Both of them told me that."

Mr. Crandall's testimony as to the events leading up to and the execution of the mutual wills was materially similar to that of Mr. Wallace. Crandall also testified that on October 27, 1936, the Browns called at the office of Wallace and Crandall and stated that they wished to change a provision of the will which left a share of the property in trust for Abigail's sister; the mutual codicils were prepared and executed "right then and there"; and one or the other of the Browns took the original codicils from the office.

The following testimony of Crandall is relevant to defendants' claim that the evidence establishes that Wallace and Crandall represented only George, not Abigail, and that Abigail was under the undue influence of George and did not understand the transaction: "I don't recall having anything [legal matters] for Mrs. Brown alone prior to the death of Mr. Brown" except that in the preparation of the mutual wills "I did certainly, of course, work professionally for Mrs. Brown prior to the death of Mr. Brown."

Previous to the preparation of the mutual wills "Mr. and Mrs. Brown both stated that they wanted to have their wills drawn . . .; that they wanted to will on the part of each of them to the survivor, but if the other spouse did survive, that the will of the surviving spouse was to specify that the heirs of Mr. Brown would have a half of the remaining estate, and the heirs of Mrs. Brown would have the other half . . ." During the ensuing consultations Mr. Brown carried on most of the conversation; he was more "a talking person" than Abigail, but she did not appear reluctant to speak or under any compulsion to keep silent.

Defendants' lengthy arguments as to the credibility and effect of the testimonies of Mr. Wallace, Mr. Crandall, and Abigail are not appropriately addressed to this court. The trier of fact was the exclusive judge of those matters. (Code Civ. Proc., §§ 1847, 2061.) Upon any fair view of the evidence favorable to supporting the findings it is clear that Abigail and George did orally agree to make mutual wills,

irrevocable upon the death of either, for the express benefit of the beneficiaries named in the wills, and that such wills were executed pursuant to and (see Rest., Contracts (1932), § 207, Illus. 1, § 208) sufficiently memorialize that agreement.

■ Defendants argue that any promise of Abigail to leave one half the property to plaintiffs, her own kin, if she survived George, was only incidental to the main purpose of the contract, which was to make sure that if she survived George *she* would receive the entire estate, and if she did not survive him, her own relatives would receive one half the estate; therefore, defendants say, the contract was not "made expressly for the benefit" of plaintiffs (Civ. Code, § 1559) and plaintiffs, as mere incidental beneficiaries, cannot enforce it. Acceptance of this argument would lead to peculiar conclusions. The will of Abigail and the will of George each set forth the gifts to the kindred of both in language which does not differentiate between the intent to benefit the testator's own kindred and the intent to benefit the kindred of the spouse. Yet Abigail would have us believe that she intended that her relatives should be the express beneficiaries of George's will if she predeceased George but only incidental beneficiaries of her will if she survived George. From this it would follow that George's will, listing the gifts to kindred of both spouses in the same straightforward manner as Abigail's, nevertheless is the vehicle of the same subtle differentiation of intent.

On the other hand, the contract evidenced by the mutual wills is readily and reasonably susceptible of the trial court's view that it was "made for the express benefit of all the persons named therein as beneficiaries." As the trial judge stated, "After having lived together for twenty-six years, . . . [George and Abigail] being fairly wise in the ways, temptations and frailties of human nature, could have entertained the firm desire that the estate which they had built together, through their own industry, thrift and sacrifice, go to relatives, even those for whom they had no deep concern and to whom they recognized no obligation or debt of gratitude, than to a second wife or husband who would have no natural or ethical claim upon the fruits of their joint labor."

■ Nor can we accept defendants' argument that the omission of the wills to refer expressly to irrevocability renders the agreement evidenced by such wills inconsistent with the oral agreement as found by the trial court. ■ Here, as in every contract, "there is an implied covenant of good faith and fair dealing that neither party will do anything which

injures the right of the other to receive the benefits of the agreement. [Citations.] ■■■ Where the parties contract to make a particular disposition of property by will, the agreement necessarily includes a promise not to breach the contract by revoking the will and failing to dispose of the property as agreed.'' (*Brown* v. *Superior Court* (1949), *supra*, 34 Cal.2d 559, 564-565 [8, 9] [212 P.2d 878].) ■■■ Also implied as part of the ''good faith and fair dealing'' is a covenant of the survivor not to make unreasonable use of the property, as by conveying it all away so that the named third party beneficiaries will receive nothing. (See *id.*, p. 565 [11] of 34 Cal.2d.)

Defendants urge that the findings that Abigail was ''independently advised'' by Wallace and Crandall and ''not . . . imposed upon'' and ''voluntarily executed'' the will ''with full knowledge and understanding of the contents and consequences,'' are contrary to the substance of the finding (XXX, XXXII) that ''At all times during the marriage to George, Abigail had complete trust, faith and confidence in him and . . . signed such papers . . . as George requested her to sign.''

Defendants rely upon the following rules: Husband and wife are ''subject, in transactions between themselves, to the general rules which control the actions of persons occupying the confidential relations with each other, as defined by the title on trusts.'' (Civ. Code, § 158.) ''All transactions between a trustee and his beneficiary during the existence of the trust, or while the influence acquired by the trustee remains, by which he obtains any advantage from his beneficiary, are presumed to be entered into by the latter without sufficient consideration, and under undue influence.'' (Civ. Code, § 2235.) A husband dealing with his wife ''must, if he would avoid the presumption of undue influence emanating from the procurement of any advantage over her, make full and fair disclosure to her of all that she should know for her benefit and protection concerning the nature and effect of the transaction, or else himself deal with her at arm's length and as he would with a stranger, all the while giving her the opportunity of independent advice as to her rights in the premises.'' (*Estate of Cover* (1922), 188 Cal. 133, 144 [7] [204 P. 583].)

■■■ The record supports the trial judge's stated view that George gained no ''advantage'' over Abigail by the agreement, for ''Abigail was to receive all the property if George died first, and she did receive it. George was to receive no more, could not have received more, if Abigail died first.'' The

suggested theory that there was some sort of "advantage" to George because at the time of the oral agreement and the execution of the mutual wills he was older than Abigail and therefore the probability was that he would die first is altogether too tenuous to prevail as a matter of law over the contrary view of the trier of fact.

Furthermore, the trial court pointed out that Abigail at the time of the execution of the mutual wills and for years thereafter was vigorous in mind and body; she was not "the frail, weak, 'clinging-vine,' vassal type of wife"; and when "respect for and perfect confidence in each other" such as George and Abigail had, existed "after twenty-six years of marriage, its roots are in experience." In the circumstances the altogether fair agreement for mutual, irrevocable wills, which gave neither spouse an "advantage" over the other, need not be stricken down because neither George nor Messrs. Crandall and Wallace insisted that Abigail employ and consult privately with other counsel.

Not controlling here are such cases as *Gregory* v. *Gregory* (1949), 92 Cal.App.2d 343, 349 [2] [206 P.2d 1122]; *Khoury* v. *Barham* (1948), 85 Cal.App.2d 202, 212 [4] [192 P.2d 823]; and *Andrew* v. *Andrew* (1942), 51 Cal.App.2d 451, 455 [1, 2] [125 P.2d 47], in which the appellate court upheld the trial court's determination based on the presumption of undue influence where the agreement in question appeared unfair, and such cases as *Matassa* v. *Matassa* (1948), 87 Cal.App.2d 206, 214-220 [1-3] [196 P.2d 599], in which the appellate court held that the evidence did not support a finding of fairness of a postnuptial agreement in circumstances strikingly different from those here (i.e., by such agreement the wife, aged 18, relinquished her right of inheritance although prior to the marriage the husband, aged 53, had told her "that half of everything that he had would be mine"; when she protested that she did not understand the agreement and wished to obtain independent advice before signing, the husband instructed her to sign and refused to allow her to consult with her family concerning the matter).

The above described view of the evidence which supports the trial court's determination that Abigail executed her will and codicil voluntarily and not under undue influence or mistake likewise supports the determination that her subsequent election to take under George's will was an intelligent ratification of their agreement. The further finding that Abigail kept and concealed her original will and codicil with the

intent of making the same inoperative is amply supported. She produced George's will and codicil for probate; after the close of probate she obtained from Wallace and Crandall the sole office copies of her will and codicil; at the trial of this case neither her will nor a copy was in court in response to plaintiffs' notice to produce; and Abigail's sole explanation was that she did not know what had happened to her will.

The attacked findings [xiii] through [xvii] concerning particularities of the relationship and dealings between Abigail and Ross, and their concealment from plaintiffs of Abigail's repudiation of her obligations to plaintiffs under her agreement with George, need be reviewed only insofar as they bear upon the more general findings which reject defendants' claims that plaintiffs were barred by limitations or laches [xviii], that the agreement of George and Abigail is contrary to public policy and inequitable to Ross and Abigail [xx], and that Abigail's will was revoked by her marriage to Ross [xxi].

As to finding [xiv]—that Ross knew and had notice of the agreement between George and Abigail—the following matters are pertinent: On December 21, 1937, Abigail, through Wallace and Crandall, caused recordation of the decree distributing to her the estate of George. The decree recited ''That in pursuance of and according to the provisions of the Last Will of said decedent [George], . . . all . . . property belonging to said estate . . . be distributed . . . to Abigail.'' The thus referred to will of George recited that it ''is made in consideration of a mutual Will on the part of my wife, Abigail . . . and in pursuance to an agreement between myself and my said wife . . . for the making of these mutual Wills on the part of each of us.'' Although the will itself was not recorded it was on file with the county clerk as a part of the records of the probate proceeding and was, of course, available for examination by any interested person.

At all pertinent times before and since the decree was recorded, section 1222 of the Probate Code has provided that ''When an order is made . . . making distribution of real property . . ., a certified copy thereof must be recorded in the office of the county recorder of each county in which the land . . . lies; and from the time of filing the same for record, notice is imparted to all persons of the contents thereof''; sections 4134 and 4135 of the Political Code (now Gov. Code, § 27326) provided that ''The recorder must file and record in the record of deeds . . . certified copies of final judgments

or decrees ; . . . affecting the title or possession of real property . . . Every such certified copy . . . from the time of filing the same . . . for record, imparts notice to all persons of the contents thereof; and subsequent purchasers . . . take with like notice and effect as if such copy of decree . . . was a duly recorded deed . . .''; and section 1213 of the Civil Code has provided that ''Every conveyance of real property . . . recorded as prescribed by law . . . is constructive notice of the contents thereof to subsequent purchasers . . .''

Furthermore, Ross was a real estate broker and dealt in real property on his own account; before he married Abigail they had business dealings with realty, and he told her, '' 'I have no ties on me, this is what I have' '' and ''[W]e had no secrets whatsoever. We discussed everything'' although ''I don't think we discussed the properties.'' In these circumstances defendants attribute remarkable naivete to Ross in contending that the finding that he ''knew and had notice of the agreement between George and Abigail'' is not supported.

Manifestly the trier of fact was not required to determine that subsequent conduct of Ross and Abigail during their marriage *ex post facto* converted Abigail's originally fair agreement with George into a harsh, unjust agreement violative of public policy.

In arguing that enforcement of the contract is inequitable defendants urge that it is not shown that plaintiffs are the victims of actual ''fraud'' on the part of defendants (citing *Brown* v. *Superior Court* (1949), *supra,* 34 Cal.2d 559, 564; *Fowler* v. *Security-First Nat. Bank* (1956), 146 Cal.App.2d 37, 47 [14] [303 P.2d 565]). Defendants emphasize that plaintiffs did not give anything for, or change position in reliance on, any promise of George or Abigail. But the court's concern in enforcing, by quasi-specific performance, an agreement such as that of George and Abigail is not that the donee beneficiaries should receive something for which they have not paid, but that the promise of Abigail for which George bargained should be performed.

Defendants assert that Abigail's will was revoked by operation of law on her marriage to Ross, because the agreement between George and Abigail contained an implied covenant that it would not be binding in the event of remarriage of the survivor. There is nothing expressed in the record or inferable therefrom which could warrant our finding such a covenant.

 Defendants, without settling upon any particular statutory period of limitation as assertedly being applicable, or upon any particular act of anyone as marking the asserted accrual of plaintiffs' cause of action, or upon any particular time when they claim that the statute of limitations began to run, urge that as a matter of law the statute of limitations had run when plaintiffs began this action on September 4, 1953. But the contract of which quasi-specific performance is decreed was not to be performed until Abigail's death. Plaintiffs were not bound to treat her contract as abandoned at any particular time prior to the date when Abigail's performance became due. (*Rogers* v. *Schlotterback* (1914), 167 Cal. 35, 46-48 [138 P. 728]; *Lubin* v. *Lubin* (1956), 144 Cal. App.2d 781, 789-790 [6] [302 P.2d 49].) Although plaintiffs could, as they did, seek equitable relief against Abigail's *inter vivos* transfers in joint tenancy in constructive fraud of their rights (*Brown* v. *Superior Court* (1949), *supra,* 34 Cal.2d 559, 564), they had their election to continue to rely on such contract and during such reliance the statute of limitations would not begin to run (*Union Sugar Co.* v. *Hollister Estate Co.* (1935), 3 Cal.2d 740, 745-746 [3] [47 P.2d 273]).

 The following comment (4 Corbin, Contracts (1951), § 989, p. 967) is pertinent: Where a defendant definitely and unconditionally repudiates a contract before the time fixed for his performance, "[t]here is no necessity for making the statutory period of limitation begin to run against the plaintiff until the day fixed by the contract for the rendition of performance, at least unless the plaintiff definitely elects to regard the anticipatory repudiation as a final breach. It is generally said that he need not so elect and that he may properly wait until the time that performance was due, before regarding the contract as broken."

We need not consider whether a definite election of a plaintiff to regard an anticipatory repudiation as a final breach might in some circumstances start the running of the statute of limitations, because there is nothing in the record here which would compel a determination that any plaintiff made any such election.

The only plaintiff who expressed a position as to the present controversy prior to the institution of this action was Maude Brewer. On July 6, 1950, Maude wrote to defendants from her home in Iowa as follows: "We have known all the time of your trouble with the Browns [the kindred of George

who were beneficiaries of the mutual wills and whose claims were settled by Ross and Abigail] and that we could have shared as they would—and still want us to join them—but we all felt if you wanted us to come in on equal shares with them you would have done it. . . ."

Later in 1950 or in 1951 defendants visited Maude in Iowa and, according to Abigail's tetimony, the following conversation took place:

Maude said that "George told her that she was to have some money." Abigail replied, "I never heard him say it. . . . We have always been here together and he has never seen you alone, he never did." Maude then "started to tell about the Brown family, and she thought she should have as much as they had, and so we tried to explain . . . that Mr. Brown had passed away, that was entirely different, I was still alive, and 'I hope I will be yet a while.' . . .

"Mr. Simpson tried to settle it with her right then and there, and he said, 'I will give you twenty thousand. . . .' Well, she said that she would think about it, and she didn't want green grass . . ." (On defendants' motion the trial court struck the foregoing testimony "only . . . insofar as it might be construed to be . . . an admission of liability.")

Obviously Maude did not express a definite election to treat Abigail's words and conduct as a final breach of contract; rather, Maude concluded that "she would think about it." ▆▆▆ And defendants' assumption that the beneficiary's mere knowledge of an anticipatory repudiation of a contract causes the statute of limitations to run is untenable.

Defendants further contend that laches is established as a matter of law. ▆▆▆ Mere delay without prejudice does not give rise to the defense (*Maguire* v. *Hibernia S. & L. Soc.* (1944), 23 Cal.2d 719, 735-736 [17-19] [146 P.2d 673, 151 A.L.R. 1062]) and the doctrine is not designed to punish plaintiffs but only to prevent unwarranted injustice (*Berniker* v. *Berniker* (1947), 30 Cal.2d 439, 448-449 [6-7] [182 P.2d 557]). In this regard the trial judge pertinently said, "The only possible fact in this case which, so far as I know, might be urged to be pregnant with such an injustice is that the defendants have been more frugal and canny in their management of their properties . . . than they would have been had they known earlier that plaintiffs intended to seek the enforcement of the contract in question. . . . The record, however, seems to indicate that they have had a pretty good time, certainly enough income to provide . . . not only the

ordinary necessities and comforts of life, but as many luxuries as persons of their age usually ask of life. . . . In the years when they were most likely to enjoy their joint estate, they were not burdened with this litigation, and it seems probable that they have had more fun than they would have had if the action were commenced years sooner than it was.''

Defendants say, ''Assuming arguendo that the judgment is otherwise proper, it is nevertheless erroneous in calculating plaintiffs' beneficial interest upon the value of the estate at Abigail's death rather than upon the value of the estate at George's death.'' (For the purpose of discussing this contention we accept defendants' assertion that the formulae of the judgment are based on ''the value of the estate at Abigail's death.'' It should be noted, however, that the constructive trust attached as of the date of the conclusion of trial; it does not purport to cover any property thereafter acquired by Abigail.)

In support of this contention defendants cite *Murphy* v. *Slaton* (1954), 154 Tex. 35 [273 S.W.2d 588, 594-595 [3, 4]], and *Ward* v. *Ward* (1955, Tex.Civ.App.), 278 S.W.2d 886, 888 [1]. Each of these cases properly construed a joint will of husband and wife as attaching only to property owned by the spouses at the time of the death of the first to die. The language of the wills showed such intention of the makers. ▮ But the Texas Supreme Court in the Murphy case recognized the right of the makers of a joint and mutual will ''to provide that all of the property owned by the survivor at his death shall pass under . . . their will.'' Here the mutual wills so provide; they read, ''If my [spouse] . . . be deceased *at the time of my demise* then . . . I hereby give . . . *my entire estate* including any . . . estate that I may have received from my said [spouse] . . . as hereinafter directed.'' (Italics added.)

▮ Defendants urge that the operation of the judgment is inequitable because it provides that ''[f]or the duration of said trust'' defendants ''may'' not deal with the trust property ''with the intent to defeat . . . the purpose of this judgment and/or of said trust or of the rights of plaintiffs . . . under the said agreement for the making of mutual wills.'' This is but another aspect of defendants' argument, contrary to the findings which, as we have seen, are supported by the evidence, that Abigail and George intelligently made a fair agreement that neither ''could, after the death of the other, . . . in any way deprive . . . [the named beneficiaries of

their agreed mutual wills] of the benefits of said agreement" and that "the survivor could have during his or her lifetime the *reasonable* use and enjoyment of their combined estates" (italics added).

Defendants further assert that, to make it possible for Ross to deal freely with his own property, the trial court should have "redistributed" the "merged" properties to Ross and Abigail. The trial court expressly offered defendants an opportunity to propose a form of judgment which would accomplish such "redistribution," and defendants declined such invitation. Therefore, they are not now in a position to raise the subject contention. The trial court was careful not to limit defendants' enjoyment of their properties any more than was necessary to effect the purposes of its decree; it provided that "Except for the restrictions herein imposed, said defendants shall be free to use . . . , sell and otherwise deal with said property to serve . . . their needs . . . and general well-being in any reasonable manner . . ." In view of defendants' long-standing attempts to make performance of Abigail's agreement with George impossible, and particularly in view of the facts that defendants deliberately commingled their properties and that Ross, entrusted with their management, failed to keep records so that they could be readily traced, the chancellor was justified in framing his decree as he did so as "to award substantial justice according to the requirements of the varying complications . . . presented . . . for adjudication." (*Times-Mirror Co.* v. *Superior Court* (1935), 3 Cal.2d 309, 331 [3] [44 P.2d 547]; *Humboldt Sav. Bank* v. *McCleverty* (1911), 161 Cal. 285, 292 [119 P. 82].)

The foregoing principle is pertinent also to our disposition of the contentions of plaintiffs, as appellants. They urge that the trial court should have required that defendants render to plaintiffs an accounting of the trust property. In support of this contention they cite, among other cases, *Newport* v. *Hatton* (1924), 195 Cal. 132, 149-151 [13, 15], 152 [231 P. 987], which holds that where remaindermen-beneficiaries can trace trust property to a commingled mass of property held by constructive trustees, " [i]t only remains for the court to ' "disentangle the account, and separate the trust from the private moneys" ' . . . [Although the life estate has not yet terminated, and the beneficiaries cannot yet recover the property,] [t]heir immediate concern is that their remainder interest in the *corpus* of the estate be preserved."

We may agree that if an accounting had been required more precision in the definition of the trust would have been possible. But where, as here, it appears that the rights of all parties have been adjusted by a decree which protects plaintiffs' remainder interest without an accounting it is not necessary to reverse and prolong this litigation in order to require such accounting.

Plaintiffs assert that they should have "an undivided 50% remainder interest in and to all trust property whereas the formulae devised by the trial court reduce that interest to 37% of all combined property of Ross, Abigail and the trust." Plaintiffs point to no evidence which would require a finding that 37 per cent of the "merged" properties of Abigail and Ross (one half of Abigail's proportionate contribution to such "merged" properties) is less than 50 per cent of the "trust res." (See finding XXIV, *supra*, pp. 581-582.) Since they do not show that finding XXIV is unsupported or that they are harmed by it there is no occasion to disturb the formulae based thereon.

This same consideration disposes of plaintiffs' further contentions that the trial court should have restored to the "trust estate" the expenses of defendants' litigation hostile to such trust (finding XXVII, *supra,* p. 582; see *Estate of Baird* (1955), 135 Cal.App.2d 343, 347 [4, 5] [287 P.2d 372]; *Estate of Vokal* (1953), 121 Cal.App.2d 252, 260 [9] [263 P.2d 64]), and the value of gifts by Abigail to Ross and his parents (finding XXVIII, *supra*, p. 582; *Hill* v. *Thomas* (1955), 135 Cal.App.2d 672, 677-678 [3, 1c] [288 P.2d 157]). It should be presumed, in support of the judgment, that the trial court, confronted with records, or a lack of records, which made mathematical precision impossible, took this difficulty into consideration and effected an approximate allowance to plaintiffs on behalf of gifts and sums expended from the trust in litigation hostile to it.

For the reasons above stated, the judgment is affirmed.

Gibson, C. J., Traynor, J., Spence, J., McComb, J., Peters, J., and White, J., concurred.