[No. E002200. Fourth Dist., Div. Two. Jan. 15, 1986.]

ROBERT MACHRIS WESTBROOK, Petitioner, v.
THE SUPERIOR COURT OF RIVERSIDE COUNTY, Respondent;
PETER F. FAIRCHILD, Real Party in Interest.

COUNSEL

Antin, Stern, Litz & Grebow, Arthur Grebow and R. Ira Spiro for Petitioner.

No appearance for Respondent.

Erwin & Anderholt and Michael J. Andelson for Real Party in Interest.

OPINION

**KAUFMAN, J.**—Petitioner Robert Machris Westbrook (Westbrook), plaintiff below, petitions this court to compel the Superior Court of Riverside

County to vacate its order expunging a lis pendens. Westbrook filed the lis pendens against a parcel of property comprising approximately 40 acres in Palm Springs, California, to which real party Peter F. Fairchild (Fairchild), the defendant below, has a ground lease.

Westbrook alleges he is entitled to a constructive trust over the property by virtue of a constructive fraud, consisting of the failure of Fairchild to make a will leaving all of his real and personal property to Westbrook.

The trial court granted Fairchild's motion to expunge the lis pendens. The court ruled that Westbrook failed to demonstrate that the prosecution of the action and the filing of the lis pendens were in good faith and for a proper purpose. Westbrook contends the court failed to apply the applicable criteria for determining whether the maintenance of the action and the filing of the lis pendens were in good faith and for a proper purpose pursuant to Code of Civil Procedure section 409.1.

*Facts*

1. *Relationship of the Parties*

Westbrook is the grandson of Bessie Machris. Bessie Machris had two daughters, Westbrook's mother, and Katherine Machris Fairchild (Katherine). After his mother died in 1953, Bessie Machris was Westbrook's legal guardian until she died in 1955.

Bessie Machris left an estate in excess of $8 million. Her will established two substantially equal testamentary trusts for the benefit of Katherine (Trust No. 1) and Westbrook, the surviving son of her second daughter (Trust No. 2). The trusts were funded with cash and securities. Westbrook alleges each trust exceeded $3 million.[1]

Trust No. 1, for the benefit of Katherine, provided that Katherine would receive the net income of the trust until she reached the age of 50 years, at which time the trust would terminate and the principal would be distributed to Katherine.

Trust No. 2, for the benefit of Westbrook, provided that he would receive the net income of the trust until the age of 21 years, and principal payments at the ages of 21, 25, 30 and 35.

---

[1]Fairchild disputes Westbrook's valuation of the trusts and alleges Trust No. 1 had a value of approximately $1.6 million and Trust No. 2 had a value of approximately $1.7 million.

Peter F. Fairchild married Katherine in 1955 and moved into the Machris family residence. After Bessie Machris died in 1955, Westbrook's aunt Katherine was appointed Westbrook's legal guardian and served as such until he reached the age of 21 in 1960. Westbrook resided in the family residence until 1968, and from 1969 to 1973.

Westbrook alleges that he and Fairchild had a close, father-son relationship, and that Westbrook relied on Fairchild as a financial advisor.

## 2. *The Will Contract*

On or about August 12, 1968, Westbrook and Fairchild entered into the agreement which underlies the present action.

The agreement provided that, in consideration of past and future business services and advice rendered by Fairchild to Westbrook, in the event Katherine died before reaching age 50 and receiving distribution of the principal of her trust, and if both Westbrook and Fairchild survived Katherine's death, Westbrook would pay Fairchild $3,000 per month for as long as Fairchild should live, beginning with the first day of the month following Katherine's death. Westbrook further agreed to give up any claims against Katherine's estate for amounts he loaned to Katherine, provided both Westbrook and Fairchild survived the probate of Katherine's estate. Westbrook had the right under the agreement, in lieu of paying $3,000 per month for Fairchild's life, to provide Fairchild with other property or an interest in a business which would be equivalent in value to supplying a sum of $3,000 per month.

The agreement further provided, "For consideration in addition to the business services and advice to [Westbrook], [Fairchild] hereby agrees to make a Will, and not to revoke the same, providing that upon [Fairchild's] death [Westbrook] shall receive all of his property, both real and personal"; and "With respect to . . . [Fairchild's] will, it is understood and agreed that [Fairchild] shall not in any way alter, change, modify, or do any act which in any way would change, the distribution of the property as set forth in [the will]."[2]

## 3. *Westbrook's Alleged Performance under the Contract*

Westbrook alleges he tendered performance under the agreement when, in 1970 (while Katherine was still alive and before she reached age 50), he

---

[2]The agreement further provided that, if any dispute arose with respect to any provision of the agreement, or in the event of any controversy or claim between the parties, the dispute, claim or controversy would be resolved by binding arbitration. So far as appears from the record, the present dispute between the parties has never been submitted to binding arbitration as provided in the agreement.

and Fairchild formed a partnership to acquire the Santa Barbara Inn. The Santa Barbara Inn was purchased for approximately $950,000. Westbrook contributed all of the cash for the purchase of the property in the sum of $684,000. Fairchild, although contributing no cash, received a 50 percent ownership interest in the partnership, and ultimately in the property.

Although the will contract provided that Westbrook's obligation to pay $3,000 per month, or its equivalent, would come into effect only if Katherine died before reaching age 50 and before termination and distribution to her of the corpus of Trust No. 1, Westbrook claims his contribution to the Santa Barbara Inn partnership constituted premature performance of the agreement which Fairchild accepted without objection.

In July 1971, Katherine reached 50 and received distribution of the principal from Trust No. 1.

In 1972, Westbrook agreed to sell his interest in the Santa Barbara Inn property to Fairchild for $684,000 to be paid over a period of several years. Westbrook alleges he was unaware at that time that Fairchild was negotiating a sale of the property.

In 1976, Fairchild obtained a loan of $1 million on the Santa Barbara Inn property, and used the proceeds of the loan for his own personal benefit. Later, in July 1976, Fairchild sold the Santa Barbara Inn for $2.2 million. A portion of the proceeds of sale of the Santa Barbara Inn was used to repay the $1 million loan. The balance owing on Fairchild's purchase of Westbrook's interest in the Santa Barbara Inn partnership was also paid when the Santa Barbara Inn was sold, apparently out of the proceeds of the sale.

Westbrook asserts that, as a result of his providing Fairchild with an interest in the Santa Barbara Inn, for no consideration,[3] Fairchild made a profit of approximately $2 million dollars and derived income in excess of $13,000 per month.

Without directly so stating, Westbrook apparently contends that either his initial contribution of cash to the partnership, or the profit realized by Fairchild from the sale of the Santa Barbara Inn, fulfilled Westbrook's obligation under the contract by providing valuable property in lieu of $3,000 per month for life.

---

[3]Fairchild apparently contributed no money. He may, however, have provided consideration in the form of services and management.

## 4. *Fairchild's Alleged Breach of the Agreement*

Westbrook alleges he believed that Fairchild would comply with his obligation to make a will in Westbrook's favor but that in 1984, Fairchild refused to confirm he had made such a will and told Westbrook he would leave him nothing.

In 1978, Fairchild had acquired a ground lease to a 40-acre parcel of real property in Palm Springs, California, which is the subject of the lis pendens here at issue. Fairchild purchased the lease for $1,175,000 and paid an additional $300,000 for improvements to the property. Fairchild acknowledges he used some personal funds, part of the proceeds from the sale of the Santa Barbara Inn, and some funds from Katherine, to pay for the ground lease.

Westbrook filed the lis pendens against the Palm Springs property because he was unaware of any other assets or property owned by Fairchild. Westbrook urges the lis pendens and a constructive trust in his favor are necessary to prevent Fairchild from placing the property and/or the equity beyond Westbrook's reach. Fairchild urges the lis pendens is preventing him from borrowing money to improve the property and make it income productive.

### *Discussion*

The ultimate issue presented is whether the trial court properly granted Fairchild's motion to expunge the lis pendens pursuant to Code of Civil Procedure section 409.1, which reads in relevant part: "At any time after notice of pendency of an action has been recorded pursuant to Section 409 or other law, the court in which the action is pending shall, upon motion of a party to the action supported by affidavit, order that the notice be expunged, unless the party filing the notice shows to the satisfaction of the court, by a preponderance of the evidence, that: [¶] (a) The action does affect title to or right of possession of the real property described in the notice; and [¶] (b) Insofar as the action affects title to or right of possession of the real property described in the notice, the party recording the notice has commenced or prosecuted the action for a proper purpose and in good faith."

Fairchild argued his motion to expunge the lis pendens below on both grounds: first, that the action did not affect title to or right of possession of the real property described in the lis pendens, and second, that Westbrook did not demonstrate that he commenced and was prosecuting the action for a proper purpose and in good faith. ■ ■ ■ ■ The trial court deter-

mined the motion on the second ground.[4] Citing *Malcolm v. Superior Court* (1981) 29 Cal.3d 518 [174 Cal.Rptr. 694, 629 P.2d 495], Westbrook contends the trial court applied the wrong standard for determining whether he acted in good faith and for a proper purpose. We are inclined to agree that to expunge on the ground it did, the trial court must have engaged in a mini-trial of the merits of Westbrook's action and concluded there was little chance of his succeeding in the action, contrary to the dictates of *Malcolm.* (See *Malcolm v. Superior Court, supra,* 29 Cal.3d at p. 528.) ▊ We need not resolve the question definitively, however, because we have concluded the motion to expunge the lis pendens should properly have been granted in any event because the action does not affect title to or right of possession of the Palm Springs property. (Code Civ. Proc., § 409.1.)

▊ " 'The fact that the action of the court may have been based upon an erroneous theory of the case, or upon an improper or unsound course of reasoning, cannot determine the question of its propriety. No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion.' (*Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117].)" (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 18-19 [112 Cal.Rptr. 786, 520 P.2d 10].) ▊ Thus, even if the court granted the motion on an erroneous ground, its decision was correct and will be upheld.

Westbrook's position that the action does affect title to the Palm Springs property is based on his contention he is entitled to quasi-specific performance of Fairchild's agreement to make a will leaving Westbrook all his property, to be effectuated through the imposition of a constructive trust upon the Palm Springs property which, in essence, Westbrook alleges is Fairchild's only or principal property. (Cf. *Coppinger v. Superior Court* (1982) 134 Cal.App.3d 883, 891 [185 Cal.Rptr. 24].) We are persuaded, however, that Westbrook's assertion that he is entitled to a constructive trust is incorrect, even if all the facts he asserts are true.

---

[4]However, the court's order did recite another basis for its decision: "Furthermore, by the provisions of the 1981 Comprehensive Settlement Agreement between the parties [settling three other lawsuits between Westbrook and Fairchild], plaintiff released any claims to the Palm Springs property which is the subject of his lis pendens. Clearly, the recording of the lis pendens in face of this release is not in good faith." Westbrook released any and all claims relating to Katherine's estate, to Fairchild's management or sale of the Santa Barbara Inn, or to Fairchild's purchase or management of the Palm Springs property. However, the release specifically excluded any claims under the contract to leave property by will. Thus, the trial court's ruling with respect to the release was incorrect.

■ ■ ■ ■ ■ Westbrook has cited no authority authorizing the imposition of a constructive trust on the Palm Springs leasehold[5] in the circumstances he claims exist in this case. As we shall explain, the law is to the contrary. ■ Westbrook relies initially on language in *Brown* v. *Superior Court* (1949) 34 Cal.2d 559, 563-564 [212 P.2d 878], later quoted in *Estate of Cooper* (1969) 274 Cal.App.2d 70, 79 [78 Cal.Rptr. 740]: "It is well settled that a person may contract to make a particular disposition of his property by will, and in case of a breach the promisee has several available remedies. He may bring an action at law for damages. (See *O'Brien* v. *O'Brien,* 197 Cal. 577, 588-589 [241 P. 861]; *Roy* v. *Pos,* 183 Cal. 359, 366-367 [191 P. 542]; *Morrison* v. *Land,* 169 Cal. 580, 590 [147 P. 259]; 4 Page on Wills [Lifetime ed.] §§ 1733, 1744.) Equitable relief in the form of 'quasi specific performance' of the contract may be obtained where the remedy at law is inadequate and the promisor has failed to make the promised disposition of his will. (*Jones* v. *Clark,* 19 Cal.2d 156 [119 P.2d 731]; *Bank of California* v. *Superior Court,* 16 Cal.2d 516, 524 [106 P.2d 879]; *Wolf* v. *Donahue,* 206 Cal. 213 [273 P. 547].) It has also been recognized that the promisees of such a contract need not wait until the death of the promisor but may seek equitable relief against *inter vivos* conveyances made by him in fraud of their rights. (*Osborn* v. *Hoyt,* 181 Cal. 336 [184 P. 854]; *Rogers* v. *Schlotterback,* 167 Cal. 35, 48 [138 P. 728]; see note, 108 A.L.R. 867; 4 Page on Wills [Lifetime ed.] §§ 1727, 1729, 1744.)" (See also *Redke* v. *Silvertrust* (1971) 6 Cal.3d 94, 100-101 [98 Cal.Rptr. 293, 490 P.2d 805]; *Notten* v. *Mensing* (1935) 3 Cal.2d 469, 473 [45 P.2d 198]; *Stahmer* v. *Schley* (1979) 96 Cal.App.3d 200, 203 [157 Cal.Rptr. 756]; see generally Annot., Remedies During Promisor's Lifetime on Contract to Convey or Will Property at Death in Consideration of Support or Services, 7 A.L.R.2d 1166.)

The law outlined by the *Brown* court is accurate where it is applicable, as appears from a reading of the authorities cited in the opinion. However, whether any one of the rules mentioned is applicable in a particular case will depend on the circumstances and context in which the case arises. The significant variables appear to be: (1) the nature and subject of the contract to leave property, that is, whether the contract relates to specific property or property which has become specific by death of a party and whether the contract restricts the right of the promisor to dispose of or otherwise deal with the property during his or her lifetime; (2) whether or not there has been an act by the promisor in contravention of the agreement; and (3) the nature and purpose of the act alleged to be in contravention of the agreement.

---

[5]A leasehold interest in real property is an estate in real property and thus may properly be subjected to a lis pendens. (*Parker* v. *Superior Court* (1970) 9 Cal.App.3d 397, 399-400 [88 Cal.Rptr. 352, 67 A.L.R.3d 743].)

For example, where the agreement is to leave specific property owned by the promisor at the time the agreement is made, the promisor may be found to have given up the right to dispose of that property during his or her lifetime and even an inter vivos transfer may be held to be in contravention of the agreement and a constructive trust imposed thereon. (*Osborn v. Hoyt* (1919) 181 Cal. 336, 340-341 [184 P. 854].) Similarly, where the agreement relates to property that is to become specifically identifiable only upon the death of the promisor (a promise to leave by will "all the property I own at my death," or a child's share of "the property I own at my death" or the like) and the promisor has died so that the property has become specifically identified, if the promisor failed to leave a will or has willed the property to someone other than the promisee or has made an inter vivos transfer intended to take effect upon death, a constructive trust may be imposed on the property in the hands of the personal representative of the promisor's estate or the promisor's transferee. (*Brewer v. Simpson* (1960) 53 Cal.2d 567, 593 et seq. [2 Cal.Rptr. 609, 349 P.2d 289]; *Jones v. Clark* (1941) 19 Cal.2d 156, 158-160 [119 P.2d 731]; *Bank of California v. Superior Court* (1940) 16 Cal.2d 516, 524 [106 P.2d 879]; *Wolf v. Donahue* (1929) 206 Cal. 213, 217-218, 220 [273 P. 547]; *Rogers v. Schlotterback* (1914) 167 Cal. 35, 47-49 [138 P. 728]; see *Van Duyne v. Vreeland* (1858) 12 N.J.Eq. 142, 157.)

Where, however, the agreement was that the promisor would leave to the promisee whatever property the promisor owned at the time of his or her death and the promisor has not yet died, it will generally be inappropriate to impose a constructive trust on specific property in the hands of the promisor for two related reasons. One, during his or her lifetime the promisor has the right to consume the property for reasonably necessary living expenses in good faith (cf. *Hardy v. Mayhew* (1910) 158 Cal. 95, 99-103 [110 P. 113]; *Estate of Mulholland* (1971) 20 Cal.App.3d 392, 397-398 [97 Cal.Rptr. 617]) and also has the right during his or her lifetime to dispose of his or her property, at least so long as that is not done for the purpose of defeating the contract or, as is sometimes said, "in fraud of the contract" (*Rogers v. Schlotterback, supra,* 167 Cal. 35, 47-48; *Van Duyne v. Vreeland, supra,* 12 N.J.Eq. 142, 153, 157; see also *Behrendt v. Abraham* (1966) 64 Cal.2d 182, 186-187 [49 Cal.Rptr. 292, 410 P.2d 828]); two, the specific property in which the promisee may claim an interest pursuant to the contract cannot be identified until the death of the promisor.

It is true that in *Van Duyne v. Vreeland, supra,* 12 N.J.Eq. 142, a decision referred to both in *Rogers v. Schlotterback, supra,* and *Osborn v. Hoyt, supra,* the court issued a protective decree in such a case even before the death of the promisor. However, the court described its decree as being in the nature of a bill quia timet rather than a constructive trust. (12 N.J.Eq.

at pp. 158-159.) More importantly, the crucial fact permitting the court to make a protective order in that case was that the promisor, Vreeland, had already exercised his right to dispose of the property during his lifetime by conveying it to Brickell, and Vreeland therefore had no further right or ability to deal with or dispose of the property. Thus the court stated: "It appears to me such a decree is equitable, and respects the rights of all parties. Vreeland cannot complain of it. The court does not interfere with his right to dispose of his property as he pleased, except so far as it is a fraud upon his agreement with the complainant. *By his conveyance to Brickell, he has deprived himself of all control over the property,* except so far as he has retained an interest in it to secure his agreement with Brickell. The decree will not interfere with the enjoyment of it, as far as he has secured it for himself." (*Van Duyne* v. *Vreeland, supra,* 12 N.J.Eq. 142, 159, italics added.)

In the case at bench, by contrast, under the cases previously cited Fairchild is entitled during his lifetime to dispose of the Palm Springs leasehold, at least for fair consideration, and indeed may consume the whole of it if that is reasonably necessary for his support and maintenance. The contract alleged by Westbrook was that Fairchild would make a will leaving Westbrook all his property upon his death. No specific property was referred to. Indeed, the Palm Springs leasehold had not then been acquired by Fairchild. There can be no question but that the contract contemplated Fairchild's liberty to sell, deal with and dispose of his property in any way except in fraud of the agreement. There is no allegation Fairchild has attempted to give the property away or dispose of it in fraud of the alleged contract with Westbrook, and if Westbrook can allege and prove that Fairchild is about to do so in contravention of the agreement, Westbrook may be entitled to injunctive relief to prevent such action on the part of Fairchild "in fraud of the contract." Indeed, that is the very relief suggested by one of the decisions upon which Westbrook principally relies. In *Estate of Cooper, supra,* 274 Cal.App.2d 70, 79, immediately before quoting the rules of law enumerated in *Brown* v. *Superior Court, supra,* 34 Cal.2d 559, the court stated: "Reviewing the language of the will it is clear enough that if during her lifetime Bessie Cooper had attempted to transfer the property, by new will or otherwise, to third persons in violation of the intention of the will[,] *she could have been enjoined from so doing* by respondents herein, as the intended beneficiaries." (Italics added.)

Westbrook also relies on the decision in *Brewer* v. *Simpson, supra,* 53 Cal.2d 567. That case, however, is unlike the case at hand. It was a joint will case in which, as construed, each spouse agreed to leave everything to the surviving spouse in consideration of the surviving spouse's agreement to leave all his or her property, including that received from the other, to

specified persons. The husband died, and, as in almost all the joint will cases, the property covered by the contract, or at least the property passing from the first decedent to the surviving spouse, became specifically known. The wife thereafter remarried and conveyed everything to herself and her new husband in joint tenancy. There was a long history of attempts to defeat the wills contract including commingling of property and failure to keep proper records.

The trial court gave judgment for the third party plaintiffs including the imposition of a trust restricting the right of the wife and her new husband to deal with the property other than to have the "reasonable use and enjoyment" of it. It further provided: "'Except for the restrictions herein imposed, said defendants shall be free to use . . ., sell and otherwise deal with said property to serve . . . their needs . . . and general well-being in any reasonable manner . . . .'" (53 Cal.2d at p. 596.)

In these circumstances the Supreme Court upheld the judgment stating: "In view of defendants' long-standing attempts to make performance of Abigail's agreement with George impossible, and particularly in view of the facts that defendants deliberately commingled their properties and that Ross, entrusted with their management, failed to keep records so that they could be readily traced, the chancellor was justified in framing his decree as he did so as 'to award substantial justice according to the requirements of the varying complications . . . presented . . . for adjudication.' (*Times-Mirror Co.* v. *Superior Court* (1935), 3 Cal.2d 309, 331 [3] [44 P.2d 547]; *Humboldt Sav. Bank* v. *McCleverty* (1911), 161 Cal. 285, 292 [119 P. 82].)" (53 Cal.2d at p. 596.)

Thus in *Brewer* unlike the case at bench some of the property had become specifically identified by the death of the first spouse, the property had been conveyed in part to a third person as a joint tenant of the surviving spouse and commingling and inadequate record keeping for the purpose of frustrating the joint will agreement were in evidence. No such circumstances appear in the case at bench.

We conclude therefore, that even if Westbrook can prove there is a binding contract between him and Fairchild as alleged, Westbrook is not entitled to have a constructive trust imposed upon the Palm Springs leasehold, and therefore the action cannot be said to affect the title to or possession of that property, so as to authorize the recording of a lis pendens. To permit a lis pendens in the circumstances of this case would in effect countenance a prejudgment attachment that would prevent even legitimate improvement and use of the property to which Fairchild is clearly entitled even if Westbrook ultimately can prove he is entitled to some relief. (See *Burger* v.

*Superior Court* (1984) 151 Cal.App.3d 1013, 1017-1018 [199 Cal.Rptr. 227].)

## Disposition

The order of the Riverside Superior Court expunging petitioner's lis pendens was providently granted. Accordingly, the petition for peremptory writ of mandate is denied. The alternative writ heretofore issued is discharged. Real party in interest shall recover his costs of this writ proceeding.

Morris, P. J., and McDaniel, J., concurred.