[S. F. No. 19891. In Bank. July 1, 1960.]

ARNOLD F. BERRI, Appellant, v. ANGELINA BERRI et al., Respondents.

Morris Lowenthal, Juliet Lowenthal and Karl D. Lyon for Appellant.

Lounibos & Lounibos for Respondents.

SCHAUER, J.—Plaintiff appeals from an adverse judgment in this action in which he seeks a declaration that certain real property, title to which plaintiff transferred to his brother in 1930, was held in trust for plaintiff. We have concluded that the evidence supports all essential findings, the findings support the judgment, and the judgment should be affirmed.

This litigation involves a claimed one-half interest in a family ranch in Marin County, which ranch the predecessors in interest of the parties to the present litigation had acquired in 1894 and which for purposes of this opinion will be called

the Berri ranch. By the year 1930 ownership of the ranch had devolved upon Arnold Berri (plaintiff herein) and his brother Lindo Berri, each of whom held an undivided one-half interest, but subject to a life estate in one half of the ranch and to the payment of certain legacies. Defendants herein are the widow and children of Lindo, who succeeded to whatever title he possessed.

For approximately 10 years prior to January, 1930, Lindo and his family had been living in Gonzales, in Monterey County, where Lindo was operating a dairy ranch. During most of this same period Arnold, who resided upon the Berri ranch, operated a dairy business on that ranch in partnership with one Conti; Lindo had no ownership interest in such dairy business but was paid rent by Arnold and Conti for Lindo's interest in the ranch land.

In January, 1930, certain creditors of Arnold commenced proceedings against his interest in the ranch, and other creditors were pressing for payment of their claims. Arnold, at that time, was also involved in domestic difficulties including litigation with his wife and had been indicted by the federal grand jury for alleged violation of a prohibition law. A family friend, McNear, offered to advance the sum of $17,500 as a loan to assist in paying Arnold's creditors, provided Arnold conveyed his title in the ranch to Lindo and the entire property, including Lindo's interest, was made security for the loan. At the request of one Bolla, a nephew of Lindo and Arnold, Lindo traveled from Gonzales to Petaluma to discuss Arnold's difficulties, and thereafter agreed to McNear's proposal.

Accordingly, in March, 1930, Arnold delivered a quitclaim deed to Lindo, and Lindo executed a deed of trust hypothecating the entire property to secure the $17,500 loan from McNear. All of the $17,500 was used by Arnold to pay his own obligations, and none of the money was received by Lindo. Arnold alleges, and he and Bolla testified, that at the time of this transaction and in McNear's office Lindo orally promised that if Arnold conveyed the title to Lindo, Lindo would hold Arnold's interest in trust for "safekeeping" and would reconvey it to Arnold when the latter's difficulties with his wife and with the federal indictment were cleared up. This is denied by defendants, who claim that by the March, 1930, transaction Lindo was buying outright Arnold's interest in the ranch, that Lindo thereafter claimed and exercised complete ownership of the property, and Arnold knew it. Both

Lindo and McNear had died before trial of this action, and thus were not available to testify. The circumstances however, as hereinafter related, appear to speak as convincingly as either Lindo or McNear could have testified if present, and the trial court found truth in the circumstances, rather than in the words of Arnold and Bolla.

Following the March, 1930, transaction Lindo disposed of his business in Gonzales and moved to a bunkhouse on the Berri ranch. Although Arnold had previously lost to creditors his interest in the dairy business being operated on that ranch, Lindo arranged to secure cattle and to operate the business in partnership with Conti. In 1931 Lindo's wife and daughters also moved from Gonzales and for lack of housing space on the Berri ranch lived with a relative on adjoining property, while Lindo remained in the bunkhouse. Arnold meantime retained possession of the main ranch house on the Berri ranch, where until April, 1938, he lived with his children. During 1930 and 1931 Arnold worked for Lindo and Conti for a monthly salary, but thereafter did outside work instead and performed only occasional small jobs on the ranch, for which he sent statements to Lindo and received payment.

The main ranch house had been built by Arnold alone in 1917, at a time when he and Lindo each owned only a one-fourth interest in the Berri ranch and the remaining one-half was owned by their uncle, B. Berri. Under a written agreement made by the three owners at that time, Arnold was to have sole use of the house until such time as the other owners paid to him their proportionate share ''of the original cost thereof,'' which in Lindo's case was agreed to be one-fourth.

In April, 1938, Arnold executed a quitclaim deed to the entire ranch property in favor of Lindo, and also a general and special written release of all claims against Lindo. Concurrently Arnold turned over the keys to the main ranch house and moved off the ranch. Thereafter Arnold lived in and around Petaluma. The release, which was received in evidence, recites a consideration of $1,000 and by its terms declares that ''I, Arnold F. Berri . . . do hereby forever release . . . Lindo F. Berri, his successors and assigns in interest, from any and all claims from the beginning of the world up to this date, including in particular, any claim of any kind and character or interest, whether as mortgagor, owner, or otherwise in the Berri Ranch . . . I do hereby specifically release any claim of equity of redemption that I may have asserted in said property ...''

For some two years following Arnold's departure the main ranch house was occupied by a sister of Arnold and Lindo, whose husband was working for Lindo on the ranch. In 1940 Lindo and his family moved into the house. Lindo died in 1946, and following probate of his estate the ranch was distributed to his wife and daughters, defendants herein, in April, 1949. Not until some six months after distribution was this action commenced by Arnold; i.e., in December, 1949.

Arnold, asserting that at all times concerned he believed that Lindo on demand would reconvey a half interest in the ranch to him and that he relied upon alleged statements of Lindo to that effect, declares further that he, Arnold, was a farmer, laborer, and carpenter, without business experience, while Lindo, ''was a man of astute business experience.'' The trial court found, however, and our inspection of the record shows the finding to be abundantly supported by the evidence, that the truth was to the contrary, that ''at all times plaintiff Arnold . . . was a man of more than average intelligence who had business experience, who had been a secretary of a school district, who had been a co-executor of an estate, who had kept a set of books and who carried on banking operations over a period of many years . . . [and who] was superior in intelligence and business experience and in general knowledge to Lindo Berri, his brother. That Lindo Berri had very little education and very little practical business experience . . . Lindo Berri was superior to Arnold . . . in . . . knowledge of agriculture and the operation of the dairy business [on the ranch property], but that in general business matters Lindo Berri was far inferior in talent, skill and aptitude to Arnold.''[1]

---

[1] Illustrative of the evidence supporting this finding is the following:

Arnold himself testified that he was born in 1882; that in about 1900, several years after completion of grammar school, he took a four-months business course in San Francisco and thereafter was employed in that city as a clerk in a ''commission house'' for approximately one year. He then returned to the Berri ranch and engaged in the dairy business in partnership with his brother Lindo and an uncle. Although Lindo moved to Point Reyes some time prior to 1917, he continued to have a partnership interest in the dairy business conducted on the ranch until he moved to Gonzales in 1920 and at that time sold out to Arnold. Thereafter, and until Lindo moved back to the Berri ranch at the time of the 1930 transaction Arnold operated the dairy business in partnership with Conti, ''kept the books'' and ''did all the book work,'' did the banking, and filed the required income tax returns.

During 1915 and 1916 Arnold acted as co-executor of his father's estate and dealt with various creditor's claims, which the attorney for the estate explained to him; when his stepmother died in 1932 Arnold filed an action against her estate ''For money that I had coming to me—money that was loaned to her, and some bills I paid for her.'' When Arnold built the main ranch house in 1917 he sought and secured the

Plaintiff contends, nevertheless, that the "findings and the evidence overwhelmingly establish that Lindo received and held Arnold's interest in the ranch in trust for Arnold." Although with respect to the evidence plaintiff in his voluminous briefs attempts to buttress his claims by various approaches—chiefly, by reliance upon only evidence which favors his own claims—the net result constitutes only a rearguing of the weight of the evidence, which would have supported a determination either way as to the existence of the alleged express parol trust. Thus, although Arnold and Bolla both testified to express promises by Lindo in McNear's office at the time of the 1930 transaction, to reconvey to Arnold when the latter's difficulties with his wife and the federal indictment were out of the way, Lindo's widow testified without objection that Lindo told her at the time of the 1930 conveyance that he had bought Arnold's interest in the ranch, and that Lindo did not say he was merely helping Arnold during the latter's difficulties. One of Lindo's daughters, who kept the books for him showing the ranch operations, also testified that her father had "bought Arnold's half" of the ranch.

Both Lindo and McNear were, as above mentioned, deceased at the time of trial, and so not available to personally give their versions of what occurred. ▮▮ However, as has already been suggested, circumstances in evidence tend strongly to support the essential findings and to negate Arnold's claims as to both the creation and the continuance of the trust relationship. Among the significant circumstances are the following facts: Arnold himself testified that following the 1930 transaction he at no time asked Lindo or Conti for

advice of an attorney, who drew the agreement between Arnold, Lindo and their uncle, "for my protection in later years in case any legal matters came up." Arnold also conceded that he had acted as a school clerk with the duty, among others, of issuing warrants for supplies and for salaries. With respect to the 1938 release and its reference to an equity of redemption, Arnold explained to the court that "it is like if you pawn something at the shop, you go down and redeem it."

Lindo's daughter Florinda testified that Arnold had been school clerk from about 1920 until he moved from the Berri ranch in 1938, and she succeeded him in the job; that the duties of the work were to keep the books, make out the warrants, pay the school teachers, order the supplies, and see that the school was in good condition; that after Lindo moved back to the Berri ranch in 1930 the witness took care of the books of the ranch operations while Lindo "did the physical work"; that Lindo's handwriting, punctuation, and grammar were very poor, whereas those of Arnold were "okay"; that she had heard Arnold say that Lindo was ignorant and on occasion ridicule Lindo and comment "You go around dressed so terribly"; that actually Lindo did not have any of the luxuries of life but instead devoted himself to the ranch work.

any accounting of the ranch operations or of the dairy business, or to see Lindo's books; he reported no ownership interest or income from the Berri ranch on income tax returns; he made no demand for any rental from his now alleged interest in the ranch; he never asked Lindo what the latter's earnings on the ranch were and never inquired as to Lindo's financial condition or as to whether the debt to McNear had been paid. Further, upon the death in 1937 of a family member which Arnold knew would result in charges of $5,600 against the ranch, of which $1,600 would properly have been chargeable against the interest in the property now claimed by Arnold (if in fact he then claimed it) he nevertheless made no inquiry as to who was going to pay the $5,600; instead, he testified that Lindo "had charge of working that out for himself; that was his own problem." Moreover, in response to the court's questions as to where Arnold expected Lindo to secure the funds to repay to McNear the $17,500 advanced to help clear Arnold's debts, Arnold testified that even though after the 1930 transaction he himself had no further interest or rights in the dairy business operated on the ranch and he had no written agreement with Lindo as to "how you were to determine when the [McNear] loan had been paid off," Arnold nevertheless expected Lindo, after deducting $45 a month for his (Lindo's) own work in his own dairy business on the ranch (operated, as stated hereinabove, in partnership with Conti), to use one-half the proceeds of Lindo's share of the dairy business to pay off McNear and so redeliver to Arnold free and clear of McNear's encumbrance Arnold's alleged one-half interest in the ranch. As pointed out by the trial court, Arnold was thus contributing neither time, effort, worry nor money to the ranch operations, but testified instead that he expected Lindo to carry the entire load on behalf of Arnold.[2] As mentioned hereinabove, Arnold billed, and was paid by, Lindo for any work done by Arnold on the ranch after Arnold

[2]In an effort to explain this situation, Arnold testified that during the years (about 1917 to 1920) that Lindo lived on Point Reyes rather than on the ranch, Arnold ran the dairy business on the ranch and after deducting a salary for himself paid Lindo one-half the profits. Arnold conceded, however, that during that time and until Lindo sold out to Arnold and moved to Gonzales in 1920, Lindo actually owned a one-half interest in the dairy business. By contrast, Arnold further conceded that he had lost his own interest in that business prior to the 1930 transaction with Lindo and so had no ownership interest in the business thereafter conducted by Lindo and Conti on the ranch. Arnold nevertheless now claims that he "understood if he [Lindo] was to transfer my interest [in the ranch] back, that I would get the business back along with it."

ceased (in 1932) working for Lindo and Conti for a regular monthly salary.

Arnold further testified that although he knew that Lindo died in 1946 he did not go to see Lindo's widow or children thereafter, that he had encountered the widow on a road near the ranch but "she ignored me. That gave me a feeling she didn't want to see me." Arnold lived within 12 miles of the ranch, knew of the probate of Lindo's will, was familiar with the manner of probate of an estate, having served as a coexecutor, but nevertheless filed no claim, demand or law suit against Lindo's estate and made no inquiry and evidenced no interest concerning distribution of the Berri ranch prior to entry of the decree of distribution in April, 1949. The filing in December, 1949, of this action claiming a trust in one-half of the property was the first notice or claim asserted by Arnold against the property, and was the first knowledge received by Lindo's widow and children, defendants herein, of any such claim. As already commented, this evidence is plainly sufficient to negate Arnold's claim of creation of a trust, rather than of an outright purchase by Lindo of Arnold's one-half interest in the ranch in 1930.

The real issue on appeal thus seems to be the effect and construction of the findings.

■ Concerning the claimed trust, the court found that at the time of the March, 1930, conveyance by Arnold to Lindo, it was "understood" by Arnold "that his interest in the said real property would be reconveyed to him by Lindo Berri upon the conclusion of the pending litigation initiated by his wife and upon the disposition of the Federal indictment." There is no finding that Lindo had promised to so reconvey or that Lindo by his own language or conduct or that of any person acting on his behalf had been responsible for, or caused Arnold to receive, an "understanding" that reconveyance would be made. On the contrary, the court found that "at all times . . . , up to the death of Lindo Berri, Arnold F. Berri knew that Lindo Berri was the sole owner of said real property. . . . That plaintiff has not, since April of 1929, been the owner of any interest in the said real property. . . . That the defendants, and . . . Lindo . . . , have at all times since April of 1929, claimed a full and complete ownership in the said real property to the entire exclusion of any claim of the plaintiff." Lindo, as above mentioned, had died two years before plaintiff instituted this action, and was therefore not available to personally testify as to his own "understanding" of the

transaction. Although the references to the year 1929 in the above quoted findings are in error, inasmuch as the findings also recite that the original conveyance by Arnold to Lindo was executed on March 19, 1930, and recorded on March 31, 1930, the error is plainly a clerical one and not fatal to the sufficiency of the findings to support the judgment. The language of the finding last hereinabove quoted effectively negates any voluntary acceptance (by Lindo) of the asserted trust which plaintiff asks us to infer from the finding as to Arnold's "understanding." (See Civ. Code, § 2216.)

Perhaps even more conclusive that the judgment for defendants must be affirmed, the court further found, on ample evidence, that plaintiff was "under no mental or physical disability at the time" he executed the general and special release in Lindo's favor in 1938; that he "freely and voluntarily signed and executed" such release; and that the consideration for the release was payment of the sum of $1,000, as recited therein.

The findings further relate that immediately prior to execution of the release and on the same date, Arnold and Lindo "engaged in an argument on the the Berri Ranch; that at that time and place, Lindo Berri told Arnold F. Berri to get off the ranch and that he did not want him there." Plaintiff attacks this last quoted finding as being "fictitious" and utterly without support in the evidence; defendants, so far as we have discovered, do not reply specifically to this particular point of plaintiff's numerous complaints about such of the findings as are adverse to plaintiff and our inspection of the record has not revealed supporting evidence. However, the finding is not essential to the judgment, and therefore lack of evidence which will support such finding is likewise not fatal. (See *Brewer* v. *Simpson* (1960), 53 Cal.2d 567, 584 [5] [2 Cal.Rptr. 609, 349 P.2d 289].)

The significant facts are that the release was executed and delivered, and that concurrently therewith plaintiff accepted the sum of $1,000, moved off the ranch, and for 12 years thereafter made no claim of ownership of any interest in the ranch or right to income therefrom, to either Lindo or Lindo's successors in interest, defendants herein.[3] Arnold's only contention in avoidance of the release appears to be his

[3]Arnold testified that he actually received the $1,000 from McNear (from whom Lindo borrowed it for the purpose), that McNear had previously told Arnold he would receive $2,000 and at the time of delivery of the $1,000 told Arnold that the additional $1,000 would be in the form of credit to Arnold against certain legacies.

assertion that he had not read it and did not know he was signing a release, that actually he was transferring to Lindo for the $1,000 an interest in the main ranch house, pursuant to the agreement made in 1917 when the house was built, and also that a confidential relationship existed and therefore the release was ineffectual. Manifestly, in the light of the entire record, including the trial court's observation of Arnold as a witness, that court was not required to, and as a reviewing court we must presume it did not, believe Arnold's testimony in this regard.

Further testimony by Arnold was that at the time he signed the 1938 release and quitclaim he asked no questions of any kind. Lindo's daughter Florinda testified that at the subject time (when Arnold moved off the ranch in 1938) she heard him tell Lindo "I am glad that it is you that has to pay off these debts, instead of me," and that Arnold further stated at about that period of time that he had "to go up and sign a release . . . and that he was going to get the thousand dollars and turn the key over." Florinda, who did the record keeping for her father, further testified that during the depression years which followed the 1930 transaction Lindo had renewed the McNear obligation from time to time, that by 1938 the total obligation had grown considerably beyond the original $17,500, that Lindo had sold other property of his own in order to raise $10,000 to pay on the obligation, and that at the time of trial of this action in December, 1951, the sum of $9,800 remained owing thereon.

 The trial court's findings declare that Arnold's "statements, acts and conduct" on the occasion of execution of the 1938 release "constituted a complete repudiation of a trust agreement if any existed. That Lindo Berri made his position clear to Arnold F. Berri regarding the said real property," but Arnold nevertheless thereafter asserted no claim against Lindo. This finding is, of course, factually consistent with, but legally makes completely immaterial, the above mentioned finding relied upon by plaintiff that it was "understood" by Arnold that his interest in the Berri ranch would be reconveyed to him by Lindo upon the conclusion of the litigation initiated by Arnold's wife and upon disposition of the Federal indictment against Arnold. If with such an "understanding" on his own part Arnold did, as he testified, inquire of Lindo prior to 1938 concerning reconveyance of Arnold's claimed one-half interest in the ranch, then the execu-

tion of the 1938 release under the circumstances shown by the evidence as related hereinabove is consistent with the trial court's conclusion that Arnold "freely and voluntarily signed and executed the release" and thereby completely repudiated or relinquished any claim of a prior trust agreement or interest deriving therefrom. As already commented, plaintiff's voluble arguments on this point are grounded on a construction of all the evidence in his own favor, contrary to the most elementary rules on appeal.

It thus appears that the circumstances surrounding execution of the release and the findings concerning it adequately and independently support the trial court's conclusion that plaintiff's claims are defeated by the quitclaim deed and by the general and special release executed in 1938 in favor of Lindo, and warrant the judgment in defendants' favor.

Inasmuch as the judgment must be affirmed for the reasons already stated no useful purpose would be served by consideration of plaintiff's further attacks on determinations of the trial court that his claims are also barred by the statute of limitations, by laches, and by estoppel. Other points raised by plaintiff do not merit discussion.

The judgment is affirmed.

Gibson, C. J., Traynor, J., McComb, J., Peters, J., White, J., and Dooling, J., concurred.