[Civ. No. 35798. Second Dist., Div. Two. Mar. 16, 1971.]

Estate of SAMUEL D. CATES, Deceased.
SANDRA A. CATES, Petitioner and Respondent, v.
DOROTHY L. NELSON et al., Objectors and Appellants.

[Civ. No. 36442. Second Dist., Div. Two. Mar. 16, 1971.]

DOROTHY L. NELSON et al.,
Plaintiffs, Cross-complainants and Appellants, v.
SANDRA A. CATES et al.,
Defendants, Cross-defendants and Respondents;
EDGAR S. KEATS et al.,
Defendants, Cross-complainants and Appellants.

(Consolidated Appeals.)

## COUNSEL

Gendel, Raskoff, Shapiro & Quittner, Frank C. Christl and Richard S. Berger and Arvey, Hodes and Mantyband for Objectors and Appellants, Plaintiffs, Cross-complainants and Appellants and Defendants, Cross-complainants and Appellants.

Roger Bentley and J. Leonard Lyons for Petitioner and Respondent and Defendants, Cross-defendants and Respondents.

## OPINION

**HERNDON, J.**—The major of these two consolidated appeals is taken from a judgment adverse to plaintiffs and favorable to respondent Sandra Cates in an action for quasi-specific performance brought to enforce a written agreement between the decedent, Samuel D. Cates, and his predeceased wife Juel, by the terms of which they promised each other that they would execute mutual and reciprocal wills which neither would revoke or change without the consent in writing of the other. The other appeal is taken from an order entered in the probate proceeding granting a family allowance to respondent Sandra Cates to whom the decedent was married less than two years after the death of his predeceased wife Juel, and eleven months before his death.

### Statement of the Case

Samuel D. Cates, hereinafter referred to as "Samuel," and Juel Denn Cates, hereinafter referred to as "Juel," were married on January 2, 1920, in Illinois and thereafter lived together in Chicago until Juel's death in 1958. During their marriage of 38 years, Samuel and Juel pooled all of their assets in a common fund, through joint bank accounts, joint safe deposit boxes, equal ownership of their various businesses and their real estate, and equal participation in the liquidation proceeds of their businesses. In 1944, when Samuel was 62 and Juel was 52, they consulted with Samuel's attorney with respect to an estate plan. As a result of that consultation, a written agreement to make reciprocal wills was prepared, and said agreement was executed by Samuel and Juel on June 6, 1944.

The prefatory portion of the agreement states, among other things: "WHEREAS, the parties hereto are husband and wife, and, because of the relationship of mutual trust and confidence between them and the mutual love, respect and faith which the parties have in each other, the parties hereto desire to make provision for the execution by each of the parties hereto of mutual and reciprocal wills, as hereinafter set forth; . . ."

The agreement continued in paragraph three as follows: "Each of the parties hereto covenants and agrees with the other party hereto not to revoke, annul, cancel, modify, amend or change his or her said Last Will and Testament either in whole or in part, without the consent in writing of the other party hereto."

Concurrently with the execution of the agreement, Samuel and Juel executed their reciprocal wills. Juel's will provided that if she predeceased Samuel all of her estate would go to Samuel. If Samuel predeceased Juel, a trust would be created making Juel the life beneficiary with the remainder

over to specified relatives of Samuel and Juel. Samuel's will provided that if Juel predeceased him, all of his estate would go to the same relatives as specified under Juel's will and the trust created for Juel. The ultimate beneficiaries under both Samuel's and Juel's wills are the appellants herein.

Approximately two years later, on June 20, 1946, Samuel and Juel executed a supplemental agreement, which modified one subparagraph of the agreement of June 6, 1944, by excluding from the property required to be placed in trust by Juel all of Samuel's and Juel's checking and savings accounts "whether [held] as joint tenants or otherwise." The supplemental agreement expressly reaffirmed the balance of the original agreement.

Thereafter, on May 19, 1947, Samuel and Juel executed a second supplemental agreement. That second supplement, pursuant to paragraph three of the original agreement, modified the ultimate distribution of Samuel's and Juel's estate by adding an additional beneficiary, Robert Keats, one of the appellants herein. Concurrently with the execution of said second supplemental agreement, and according to the provisions thereof, Samuel executed a codicil to his will of June 6, 1944.

On November 21, 1949, Samuel and Juel again reaffirmed their agreement to make reciprocal wills by executing a third supplemental agreement. The third supplement made further minor changes in the proposed ultimate disposition of the estate, and said changes were reflected in Samuel's concurrently executed second codicil to his will of June 6, 1944.

Juel died on May 29, 1958, without having revoked her will of June 6, 1944, made pursuant to the reciprocal will agreement. After Juel's death, Samuel filed her will in the Probate Court of Cook County, Illinois, but did not offer it for probate at that time. Juel's will was probated after Samuel's death. However, upon the death of Juel, Samuel received personal property valued at $1,100, an insurance policy on Samuel's life with a cash surrender value of $3,300.42, and Juel's one-half of all joint tenancy property valued at $41,964.85. Samuel claimed that the $106,200 worth of bearer bonds kept in Samuel's and Juel's joint safe deposit box was his own separate property.

Samuel took possession of and title to all of Juel's assets and thereafter moved to California. In approximately August 1959, Samuel met respondent Sandra A. Cates, then known as Sandra A. Carman (hereinafter referred to as "Sandra"), and began courting her. Samuel decided to marry Sandra and he consulted his California attorney, W. Blair Gibbens (now a retired Judge of the Santa Monica Municipal Court), concerning the preparation of an antenuptial agreement. Judge Gibbens drafted such an agreement and, at a second meeting attended by Sandra (who was at that

time a real estate broker), gave the draft to Samuel. At that meeting, in Sandra's presence, Judge Gibbens referred to the Illinois agreements between Samuel and Juel and advised Samuel to check with his attorneys in Illinois to clarify his rights under those agreements. Although Samuel and Sandra had discussed the execution of an antenuptial agreement prior to their marriage, they did not execute the agreement drafted by Judge Gibbens.

On February 7, 1960, when Samuel was approximately 79 years old and Sandra was 65, Samuel and Sandra were married. After the marriage, Samuel received from the Northern Trust Co. of Chicago, the custodian of the reciprocal will agreement of June 6, 1944, and the executor named in the reciprocal wills, a written request that he affirm the reciprocal will agreement and the wills pursuant thereto, and reaffirm that the Northern Trust Co. was still the executor under Samuel's will. Samuel, in writing, reaffirmed his will of June 6, 1944, and the codicils thereto, and on March 18, 1960 (over a month after his marriage to Sandra) returned such written affirmation to his attorney, J. R. Cohler, instructing him to transmit the affirmation to the Northern Trust Co.

In approximately the end of May 1960, Sandra took Samuel to attorney J. Leonard Lyons for consultation with respect to the drafting of a California will. On June 2, 1960, Samuel executed a California will that purported to revoke his reciprocal will of June 6, 1944, and all codicils thereto. Whereas Samuel's reciprocal Illinois will left his estate directly to his and Juel's heirs, the California will, after bequeathing $5,000 outright to Sandra (increased to $10,000 by a codicil of July 6, 1960), placed the balance of his estate in trust with a life estate to Sandra. The trust contained liberal provisions for invasion of the corpus, and bequeathed 75 percent of the remainder to Samuel's and Juel's heirs and the remaining 25 percent to persons not mentioned in the Illinois reciprocal wills (20 percent to Sandra's nieces and 5 percent to "friends").

On January 18, 1961, only eleven months after his marriage to Sandra, Samuel died leaving an estate consisting of personal assets in excess of $100,000 and real property in the State of Illinois, which real property had been acquired and held in joint tenancy by Samuel and Juel. On February 14, 1961, Title Insurance and Trust Company was appointed executor under the California will, and as executor it caused ancillary proceedings to be commenced in the Probate Court of Cook County, Illinois.

On August 31, 1961, an action was brought in the Chancery Division of the Circuit Court of Cook County, Illinois by the then living Max and Clara Keats, heirs under Samuel's reciprocal Illinois will, against Sandra and others. Said action sought to enforce the provisions of the June 6,

1944 reciprocal will agreement and sought a decree avoiding Samuel's California will.

While said Illinois action was pending, the appellants filed the action which is the subject of this appeal in the Los Angeles Superior Court in an attempt to enforce the June 6, 1944, agreement between Samuel and Juel. The remaindermen of the trust purportedly created by the California will who were not named under the Illinois will stipulated to judgment with the exception of Sandra who remains as the only defendant in the California action other than the Title Insurance and Trust Company which, as required by law, assumed the position of a neutral stakeholder.

By the time the California action came to trial, the Illinois action of Keats v. Cates had been decided by the trial court and a decree had been entered in favor of plaintiffs. This decree impressed a trust on all of Samuel's assets in favor of the beneficiaries named in his reciprocal Illinois will in accordance with his June 6, 1944, agreement with Juel. Defendants Sandra and Title Insurance and Trust Company appealed from the Illinois decree.

The California action was tried on October 3, 4 and 5, 1966, before the Honorable Robert H. Patton. During the course of that trial, plaintiffs contended not only that they should prevail under California law, but also that the doctrine of collateral estoppel operated to preclude the California court from making findings of fact contrary to those of the Illinois chancellor. Upon conclusion of the evidence, it was agreed that written briefs would be substituted for oral argument, and each side submitted such a brief. On March 14, 1967, the court issued its minute order indicating that it intended to render judgment for defendants, and, on March 27, 1967, filed its memorandum opinion setting forth the reasons for its proposed decision. Counsel for defendants was directed to prepare and serve findings of fact, conclusions of law and a proposed form of judgment. As we shall explain hereinafter, the findings were not signed and judgment was not entered in the California action until October 30, 1969, after a delay of approximately two and a half years.

Meanwhile, on October 10, 1968, the Appellate Court of Illinois, First Judicial District, filed its opinion affirming the decree of the Chancellor of the Circuit Court of Cook County, Illinois, except as to the portion of the decree that impressed a lien upon Samuel's personal property. The Appellate Court held that the Illinois trial court did not have jurisdiction under the Illinois long-arm statute to decree a lien upon the personal property in California, but in its opinion reported in *Keats* v. *Cates,* 100 Ill.App.2d 177 [241 N.E.2d 645], it specifically held that the findings of fact made by the chancellor were supported by the evidence. Sandra's petition to the

Supreme Court of Illinois for review of said decision was denied on January 27, 1969.

On May 21, 1969, over two years had elapsed since the trial court in the California action had announced its intended decision, but no judgment had yet been rendered. On that date the trial court granted the motion of the plaintiffs (appellants herein) to set aside the submission of the case, and to reopen the cause for the purpose of receiving evidence of the Illinois Appellate Court decisions. The court admitted in evidence an exemplified copy of the order of the Supreme Court of Illinois denying a hearing in *Keats* v. *Cates*, and took judicial notice of the opinion in *Keats* v. *Cates* filed by the Illinois Court of Appeal. On October 30, 1969, over two and one-half years after it had announced its intended decision, the court below filed its findings of fact and conclusions of law, and concurrently entered its judgment for defendant, the respondent herein.

### Appellants' Assignments of Error

Appellants have presented arguments in support of the following assignments of error: (1) the trial court erroneously held that the reciprocal will agreement between Samuel and Juel was invalid and unenforceable for lack of adequate consideration; this holding was based upon an unsupported finding that Samuel did not acquire any property or receive any substantial benefits under or by virtue of the agreement or under Juel's will; (2) the trial court erroneously held that the agreement was invalid and unenforceable on the basis of its unsupported finding that Sandra married Samuel without knowledge of the existence of his agreement with Juel, his former wife; (3) the trial court's finding that Samuel had instructed Judge Gibbens not to disclose to Sandra the existence of the reciprocal will agreement is wholly without evidentiary support and is contradicted by the testimony of Judge Gibbens which the trial court stated it would accept as true insofar as there might be any conflict between his testimony and that of Sandra; (4) the trial court erroneously refused to apply the doctrine of res judicata, especially in its collateral estoppel aspect, on the basis of the findings and the final judgment of the Illinois court rendered and affirmed after a plenary trial and after appellate proceedings in both of which Sandra personally appeared and litigated identical issues of law and fact which are determinative of the instant action; (5) the trial court erred in its finding that Samuel's California will was substantially identical to his Illinois reciprocal will.

We have concluded that the foregoing assignments of error are well taken and that both the uncontradicted evidence disclosed by the instant record and the dictates of the doctrine of collateral estoppel concur and

combine to require findings which, as a matter of law, entitle appellants to judgment. Samuel's agreement with his predeceased wife Juel was a valid and enforceable contract supported by adequate consideration and respondent married him with knowledge of its existence. ■ Respondent's eleven-month marriage to Samuel vested her with no superior equities sufficient to justify the trial court's refusal to enforce the agreement.

### Agreements to Make Reciprocal Wills Are Valid and Enforceable in California

Controlling California decisions are in complete accord with the decisions of the Illinois courts and with the law generally prevailing throughout the United States that clear and definite agreements of the type involved in the case at bench, supported by adequate consideration and possessing the attributes of honesty, fairness and reasonableness, will be enforced unless such superior equities have intervened as to render enforcement unfair, unreasonable or unjust to innocent third parties. (*Brewer* v. *Simpson,* 53 Cal.2d 567 [2 Cal.Rptr. 609, 349 P.2d 289]; *Brown* v. *Superior Court,* 34 Cal.2d 559 [212 P.2d 878]; *Goldstein* v. *Hoffman,* 213 Cal.App.2d 803 [29 Cal.Rptr. 334]; see also, 54 Cal.Jur.2d, Wills, §§ 528-529, pp. 40-44, and decisions cited.)

It would unduly and unnecessarily extend this opinion to undertake a detailed analysis of the numerous California decisions dealing with this subject matter. We deem it sufficient to limit our discussion to the more recent cases involving similar factual elements.

*Brewer* v. *Simpson, supra,* 53 Cal.2d 567, appears to be the most authoritative and helpful of the precedents because of the similarities between the facts and the relationships there involved and those presented in the case at bench. In that case the plaintiffs sought specific performance of an *oral* agreement to make mutual wills. Defendant Abigail Simpson and her former husband George Brown had made mutual wills which provided that all property of the first to die should go to the survivor and all property of the survivor should go one-half to named relatives of George and one-half to named relatives of Abigail. George died and Abigail took property under his mutual will. She married the defendant E. Ross Simpson and transferred all of her property to herself and Ross in joint tenancy. Plaintiffs then brought their action and the trial court awarded them the major part of the relief sought by them. In affirming the judgment of the trial court, the Supreme Court summarized the basic findings and the effect of the judgment as follows at page 576:

"The trial court found, among other things, that there was and is an enforceable oral agreement between Abigail and George that they would

make the mutual wills and 'that neither George nor Abigail could, after the death of the other, change the . . . named beneficiaries or in any way deprive them of the benefits of said agreement; . . . the survivor could have during his or her lifetime the reasonable use and enjoyment of their combined estates . . .' To effect the agreement the judgment impresses a trust for plaintiffs' benefit on all property owned by Abigail, or by Abigail and her present husband Ross in joint tenancy, on the date of conclusion of trial; it provides that for the duration of the trust neither Abigail nor Ross can deal with trust property so as to obstruct plaintiffs' rights; and it sets forth formulae for computing the share of the trust property which plaintiffs shall receive on Abigail's death, either if she predeceases Ross or if he predeceases her."

The following language from *Brewer* at page 592 is particularly apposite: "Manifestly the trier of fact was not required to determine that subsequent conduct of Ross and Abigail during their marriage *ex post facto* converted Abigail's originally fair agreement with George into a harsh, unjust agreement violative of public policy.

"In arguing that enforcement of the contract is inequitable defendants urge that it is not shown that plaintiffs are the victims of actual 'fraud' on the part of defendants (citing *Brown* v. *Superior Court* (1949) *supra*, 34 Cal.2d 559, 564 [212 P.2d 878]; *Fowler* v. *Security-First Nat. Bank* (1956) 146 Cal.App.2d 37, 47 [303 P.2d 565]). Defendants emphasize that plaintiffs did not give anything for, or change position in reliance on, any promise of George or Abigail. But the court's concern in enforcing, by quasi-specific performance, an agreement such as that of George and Abigail is not that the donee beneficiaries should receive something for which they have not paid, but that the promise of Abigail for which George bargained should be performed."

The equities favoring appellants in the case at bench are very substantially stronger than those which favored the plaintiffs in *Brewer*. In *Brewer*, the plaintiffs stood in the shoes of George whose marriage to Abigail ended with his death after twenty-seven years. In the case at bench appellants stand in the shoes of Juel whose marriage to Samuel had a duration of thirty-eight years. In *Brewer*, Abigail had been married to Ross, her second husband, for some five years when that case was decided. In the case at bench Sandra's marriage to Samuel had endured only eleven months when it ended with his death.

The issue as to whether the second spouse had knowledge of the existence of the mutual will agreement was disputed in *Brewer*, but the Supreme Court

held that in view of the availability of notice concerning the contract and the status of the second spouse as a real estate broker, it was reasonable for the trial court to attribute knowledge of the contract to him.

It is a coincidence that in the case at bench Sandra had been employed for many years as a real estate broker at the time of her marriage to Samuel. Of far greater importance, however, is the fact that the finding in the present case that Sandra lacked knowledge is contradicted by the clear and unequivocal testimony of Judge Gibbens which the trial judge stated he would accept in preference to that of Sandra.

*Brown* v. *Superior Court, supra,* 34 Cal.2d 559, involved the same parties and the same controversy as in *Brewer* v. *Simpson, supra,* 53 Cal.2d 567. ■ In that decision the Supreme Court stated the law as follows at pages 563-564:

"It is well settled that a person may contract to make a particular disposition of his property by will, and in case of a breach the promisee has several available remedies. He may bring an action at law for damages. [Citations.] Equitable relief in the form of 'quasi specific performance' of the contract may be obtained where the remedy at law is inadequate and the promisor has failed to make the promised disposition of his will. [Citations.] It has also been recognized that the promisees of such a contract need not wait until the death of the promisor but may seek equitable relief against *inter vivos* conveyances made by him in fraud of their rights. [Citations.]

"The right to enforce such a contract to make a particular disposition of property on death is not restricted to the promisee. Where two parties agree to make mutual wills, each promising to dispose of his property to the other or, if the other be dead, to certain third persons, and one of the parties performs by leaving his property to the other, the intended devisees and legatees are entitled to enforce their rights as beneficiaries under the agreement."

In *Goldstein* v. *Hoffman, supra,* 213 Cal.App.2d 803, the trial court granted plaintiff's motion for a summary judgment in an action to enforce an agreement by the terms of which the promisor had agreed to make a specified disposition of his property by will. In affirming the summary judgment, the Court of Appeal discusses numerous precedents establishing the validity of such agreements and the remedies available to the intended beneficiaries thereof. At pages 811-812 the applicable law is stated as follows:

### "The Agreement to Make a Will

"The statutes of this state provide that a person may make a valid agreement in writing binding himself legally to make a particular disposition of his property by will. (Civ. Code, § 1624, subd. 6; Code Civ. Proc., § 1973, subd. 6; *Wolf* v. *Donahue,* 206 Cal. 213, 220 [273 P. 547].) Accordingly, where a party contracts to make a particular disposition of property by will, the agreement necessarily includes a promise not to breach the contract by revoking the will and failing to dispose of the property as agreed. (*Brown* v. *Superior Court,* 34 Cal.2d 559, 564-565 [212 P.2d 878]; *Brewer* v. *Simpson,* 53 Cal.2d 567, 589 [2 Cal.Rptr. 609, 349 P.2d 289].) The rights of the parties to such an agreement depend upon the contract, and the revocation of the will or other breach of the contract does not prevent the intended devisee or legatee from enforcing the contractual obligations. (*Brown* v. *Superior Court, supra,* p. 565; *Daniels* v. *Bridges,* 123 Cal.App.2d 585, 589 [267 P.2d 343].) The party who agrees to make a particular disposition of property by will pursuant to such a written agreement is estopped from making any disposition of the property different from that contemplated, and such estoppel cannot be avoided by his subsequent marriage or a will in disregard of the terms of the contract. The basis of the estoppel lies in the acceptance of the benefits of the agreement by the promisor. (*Sonnicksen* v. *Sonnicksen,* 45 Cal.App.2d 46, 55 [113 P.2d 495].)"

### The Reciprocal Will Agreement Was Supported by Adequate Consideration

As the facts recited in our statement of the case clearly show, the trial court's findings to the effect that Samuel did not receive any property or substantial benefits under the reciprocal will agreement or under Juel's will are wholly without evidentiary support and are contradicted by the undisputed evidence. Moreover, as we shall develop hereinafter, said findings were made in violation of the doctrine of collateral estoppel. The trial court's findings and its conclusions of law that the reciprocal will agreement is unenforceable for want of adequate consideration manifest a misconception of the law as enunciated in *Brewer* v. *Simpson, supra, Brown* v. *Superior Court, supra,* and *Goldstein* v. *Hoffman, supra,* as our quotations from those and other decisions sufficiently demonstrate.

The uncontradicted evidence establishes beyond reasonable doubt that throughout their 38-year marriage Samuel and Juel consistently pooled their assets to the accumulation of which Juel made very substantial contributions. The federal income tax returns filed by Samuel and Juel for

the calendar years 1943, 1944 and 1945 disclose the existence of a partnership between them and reveal that Juel had a separate income of $32,603.75 for 1943, $44,407.38 for 1944, and $35,472.18 for 1945, or a total of $112,483.31 for the three years.

Robert Heinseimer, the certified public accountant who handled Samuel's and Juel's accounting work from 1949 until Samuel's death in 1961, testified as follows:

"Q. Did you have occasion to examine the receipts and disbursements of Samuel and Juel Cates with respect to their investments? A. Yes. Q. What accounts were those handled through? A. Those were regularly handled through the Northern Trust account. Q. Do you know whether or not their funds were commingled during all that time? A. Very definitely were. Q. Did they ever treat the funds of one separately from the other? A. Not to my knowledge."

It is apparent from the foregoing and other uncontradicted evidence in the record that Samuel and Juel took title to their real and personal property in joint tenancy because each relied upon the promises of the other as stated in the provisions of the reciprocal will agreement and the wills executed pursuant thereto. The trial judge in this case indicated at least a partial recognition of the status of the property of these parties when he commented, "As far as I am concerned it is just like community property . . . so I will look at Juel, the decedent Juel's interest in this, just the same as if it had been a community property estate."

### The Trial Court Erroneously Found That W. Blair Gibbens Did Not Reveal the Existence of the Illinois Agreements to Sandra.

The trial court stated in its memorandum opinion, and in its findings of fact found, that Samuel had specifically instructed his attorney, W. Blair Gibbens, not to mention the 1944 Illinois agreements to Sandra. There is no evidentiary basis for this finding. Indeed, it is contradicted by any reasonable interpretation of the testimony of Judge Gibbens.

Judge Gibbens testified that he first met Samuel in the early part of 1959, and represented him until February of 1960; that in the course of this relationship Samuel told him about the agreements that Samuel had with his deceased wife; that he, Judge Gibbens, also had received communications from Samuel's Chicago attorney to the same effect; that when he first discussed this subject with Samuel he and Samuel were alone in his office; that he first became aware of Samuel's plan to marry Sandra some time in January of 1960. Further testimony given by Judge Gibbens is reported as follows:

"Q. Now, during this conversation with Mr. Cates concerning his intention to marry a Sandra Carman, what in substance was said by Mr. Cates to you and you to him, the substance of the conversation. . . . A. Well, Mr. Cates came in, as I remember, in January 1960. He said that he had met a lady that he wanted to marry, and he proposed to marry. I said, 'Well, how long have you known this woman?' He said, 'Not very long,' but he said, 'I am going to marry her.' I said, 'Well, now at your age, you know most women would be after you for your money. Do you know what you are doing?' He said, 'Yes. I am determined to marry this woman.' I said, 'Well, in view of your agreements in Illinois with your former wife, you had better make some agreement with her as to your assets.' He said, 'I will.' I said, 'You'd better make an antenuptial agreement.' I said, 'I think that should be prepared by your Chicago attorneys. They know about the situation back there.' 'Well,' he said, 'you can make it up but,' he said, 'don't put anything in there that will discourage this woman because regardless of anything I am going to marry her.' Q. Now, after that meeting in your office, Judge, did you undertake the preparation of an antenuptial agreement? A. Yes. I prepared at his instructions, he came in again, I prepared at his instructions a memorandum which I subsequently submitted to him for his inspection and consideration. And he again told me that he didn't want anything in any agreement that would discourage her because he proposed to marry her anyway. And regardless of what his agreement had been, he was going to marry her, and he didn't want to discourage her. He said, 'As a matter of fact, I will bring her in. I want you to meet her.' I said, 'OK.' Q. All right. At any time during your representation of Samuel Cates did you meet Sandra Carman before she was married to Mr. Cates? A. I did. Q. And where did that meeting take place? A. In my office. Q. At the time of the meeting who was present? A. Mr. Cates, the lady and myself. Q. 'The lady,' referring to Sandra Carman, is that correct? A. That's right. Q. And do you recall approximately when that meeting took place? A. Oh, sometime the latter part of January I would say 1960, or thereabouts. Q. And was a conversation then had between the three of you? A. That's right. Q. Would you tell me the substance of what was said at that meeting? . . . A. Well, Mr. Cates came in with this lady Sandra Carman. He introduced me to her. He said, 'This is the lady I am going to marry.' And I said, 'Well, I am happy to meet you. I hope that you will be happy, and I hope that you treat Mr. Cates properly. I can see that you are much younger than he is, and I would hope that you would give him a proper home and take care of him.' She said, 'Oh, I will.' Then Mr. Cates said to me, 'Look at the diamond I bought her.' And she then exhibited to me a ring which she had

on her finger, a diamond that was a sizeable number of carats, I don't know how many, a very beautiful ring. One reason I specifically remember this visit was because of that fact. And I said, 'Well, Mr. Cates, what about your agreement? You know you have property you had when you married, and you are marrying this woman and no doubt Mrs.—Mrs. Cates, you have'—or Mrs. Carman, I think she had been previously married, I don't know, I don't remember. I said, 'You probably have assets of your own.' She said, 'Yes.' I said, 'Well, both of you should see to it that the assets that you now have remain your own property during the marriage.' She didn't reply, and I said, 'Well, Mr. Cates, you know you still have this problem in Illinois. You'd better take it up with your Illinois attorneys because you have made certain agreements back there'—I don't remember exactly what they were—'agreements to make a will or trust involved with your former wife, and you'd better see what your rights are under those.' 'Well,' he said, 'you make it up and I will talk to you later about it.' And after a few unimportant pleasantries probably between us, they left."

There is nothing in the testimony of Judge Gibbens to support the finding that he refrained from telling Sandra about the Illinois agreement. ▆▆▆ On the contrary, as the above quoted testimony clearly shows, Judge Gibbens, with admirable candor and honesty, made statements in the presence of Sandra more than sufficient to put her on notice of the existence of the Illinois agreements. Judge Gibbens clearly indicated his unwillingness to be a party to any such blatantly dishonest concealment.

The trial judge in this case made these comments in his memorandum of decision: "There can be no credibility contest here. Judge Gibbens has no conceivable interest in the outcome of this case, while Sandra is most vitally if not desperately, in the outcome. If the conclusion I have come to were not deducible from the testimony of Judge Gibbens, it would not have been drawn at all. . . . If I had believed, as did the learned Chancellor, that Sandra had been given actual notice of the 1944 reciprocal will agreement prior to her marriage to Samuel I might well have reached a different view as to the balance of the equities."

We conclude not only that the trial court in this case overemphasized the legal significance of knowledge on the part of the second spouse, but also made an unsupported finding on the basis of the testimony of Judge Gibbens. In our view the learned Illinois chancellor made the correct finding on the basis of the only reasonable interpretation of that testimony.

▆▆▆ It should be emphasized that the enforceability of a reciprocal will agreement against the beneficiary of a will or other disposition made by the surviving promisor in violation of the agreement is not dependent upon

such beneficiary's *knowledge* that his claim of right is founded upon a flagrant violation of moral and contractual duty by his benefactor. (Cf. *Rundell* v. *McDonald*, 62 Cal.App. 721 [217 P. 1082] (agreement held enforceable despite specific finding of lack of knowledge), and *Goldstein* v. *Hoffman, supra*, 213 Cal.App.2d 803 (summary judgment affirmed and plaintiffs' affidavits held sufficient although silent with respect to knowledge).)

At most, the lack of knowledge, *combined with other circumstances,* may contribute support for a claim of superior equity sufficient to provide a basis for *limiting* enforceability. If the law were otherwise, such agreements would be in a real sense illusory. Certainly it would be contrary to every dictate of reason to hold that it is within the power of a surviving spouse to avoid a reciprocal will agreement by the simple process of remarrying and withholding knowledge of the agreement from his second spouse. It bears repetition that Sandra's eleven-month marriage was insufficient to vest her with any superior equity sufficient to nullify the reciprocal will agreement involved in the case at bench.

### The Trial Court Erred in Refusing to Apply the Doctrine of Res Judicata at Least in Its Collateral Estoppel Aspect.

As we have recited, plaintiffs in their Illinois suit sought essentially the same relief against Sandra as that which they now seek in the instant California proceedings. Sandra appeared in the Illinois litigation and challenged the validity and enforceability of the reciprocal will agreement upon substantially the same grounds as those upon which she now relies herein. She sought from the Illinois courts a judgment in her favor, not only as to the Illinois real property, but also as to the personal property in the hands of the California executor.

The Chancery Division of the Circuit Court of Illinois made detailed and specific findings of fact favorable to the plaintiffs on all of the litigated issues of law and fact including the adequacy of the consideration for the agreement and the fact that Sandra had knowledge of its existence when she married Samuel.

On the appeal taken by Sandra and the executor of Samuel's last will, the Appellate Court of Illinois affirmed the decree of the Circuit Court insofar as it determined the validity and enforceability of the agreement and expressly declared that the evidence supported the findings of fact upon which that decree was based. (*Keats* v. *Cates, supra,* 100 Ill.App.2d

177 [241 N.E.2d 645].) The following excerpts from the cited decision are indicative of its most pertinent determinations:

"The evidence before the master in chancery showed that Samuel Cates and Juel Cates executed the contract for reciprocal wills after careful preparation, that they modified the agreement three times, always on the assumption that the initial agreement was binding, and that only after Juel's death and in anticipation of his second marriage did Samuel attempt to avoid his obligations thereunder. The master found adequate consideration for the contract in the mutual promises of the parties and the giving up by Juel of her right to end the joint tenancy in the real and personal property of the parties. These findings are supported by the evidence. The court found that while lack of notice to or knowledge by Sandra of the existence of the reciprocal agreement could not in any manner affect its validity, there was evidence supporting the finding of the chancellor that Sandra did in fact have notice and was thereby afforded an opportunity to inquire into the nature of the agreement. That finding is based upon the testimony of W. Blair Gibbens, the attorney who represented Samuel prior to his death. Gibbens testified that Samuel and Sandra came to his office and discussed an antenuptial property agreement. In Sandra's presence Gibbens referred to the Illinois agreement and advised Samuel to check with his attorneys in Illinois and clarify his rights under the contract. There was ample basis therefore for the finding that Sandra was aware of the agreement prior to her marriage to Samuel. . . .

"The evidence amply reveals the existence of a contract to execute reciprocal wills and the execution of such a contract by both parties. Under Illinois law that contract became irrevocable upon the death of Juel Cates. The court properly impressed a trust on the Illinois real estate of the deceased in favor of the beneficiaries under the agreement and properly ordered an accounting of the rents and profits thereof. It was without power however to enter an order with respect to the personal property in the estate of Samuel Cates." (Pp. 652-653.)

The petition of Sandra and her codefendant for a hearing in the Supreme Court of Illinois was denied on January 27, 1969. Thereafter, on May 21, 1969, the trial of the instant California action was resumed and the trial court received in evidence an exemplified copy of the Illinois decree and declared that it would take judicial notice of the Illinois appellate proceedings including the cited decision of the Appellate Court of Illinois. Nevertheless, some five months later, on October 30, 1969, the trial court adhered to its originally announced intention, made findings of fact and conclusions of law directly opposite to those of the Illinois court, and ordered judgment accordingly.

### The Doctrine of Res Judicata and Its Application

In *Teitelbaum Furs, Inc.* v. *Dominion Ins. Co., Ltd.* (1962) 58 Cal.2d 601, 604 [25 Cal.Rptr. 559, 375 P.2d 439], the dual aspect of the doctrine of res judicata and the elements essential to its application were restated as follows:

"The doctrine of res judicata has a double aspect: (1) it 'precludes parties or their privies from relitigating a cause of action that has been finally determined by a court of competent jurisdiction.' (2) 'Any issue necessarily decided in such litigation is conclusively determined as to the parties or their privies if it is involved in a subsequent lawsuit on a different cause of action.' (*Bernhard* v. *Bank of America*, 19 Cal.2d 807, 810 [122 P.2d 892]; see *Taylor* v. *Hawkinson*, 47 Cal.2d 893, 895-896 [306 P.2d 797].) In the present case, since plaintiffs' cause of action is different from that of the state in the criminal proceeding, we are concerned with the latter aspect, often termed collateral estoppel.

"In the *Bernhard* case, *supra,* this court rejected the doctrine of mutuality of estoppel that had been applied to limit the scope of collateral estoppel, and held three questions to be pertinent in determining the validity of the plea. 'Was the issue decided in the prior adjudication identical with the one presented in the action in question? Was there a final judgment on the merits? Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?' (19 Cal.2d at p. 813.)"

In *Lortz* v. *Connell* (1969) 273 Cal.App.2d 286, 296-297 [78 Cal.Rptr. 6], the rules governing the application of the doctrine of collateral estoppel were stated with a quotation from *Todhunter* v. *Smith* (1934) 219 Cal. 690, 694-695 [28 P.2d 916], as follows:

"In *Todhunter* v. *Smith, supra,* the court ruled: 'By virtue of the doctrine of *res judicata* the final determination of a court of competent jurisdiction necessarily affirming the existence of any fact is conclusive evidence of the existence of that fact when it is again in issue in subsequent litigation between the same parties in the same or any other court. The facts decided in the first suit cannot be disputed or relitigated although the later suit is upon a different cause of action. [Citations.] The doctrine of *res judicata* has a double aspect. A former judgment operates as a bar against a second action upon the same cause, but in a later action upon a different claim or cause of action, it operates as an estoppel or conclusive adjudication as to such issues in the second action as were actually litigated and determined in the first action.' (219 Cal. at pp. 694-695.) The trial court could not directly disregard this doctrine because it believed the earlier case was improperly decided. It is concluded that it cannot do so indirectly for the same reasons.

"However, the logical application of the doctrine of collateral estoppel reveals a possible flaw in plaintiff's case. As noted in *Sutphin* v. *Speik, supra* [15 Cal.2d 195 (99 P.2d 652, 101 P.2d 497)]: ". . . the rule goes further. If the matter was within the scope of the action, related to the subject-matter and relevant to the issues, so that it *could* have been raised, the judgment is conclusive on it despite the fact that it was not in fact expressly pleaded or otherwise urged. The reason for this is manifest. A party cannot by negligence or design withhold issues and litigate them in consecutive actions. Hence the rule is that the prior judgment is *res judicata* on matters which were raised or could have been raised, on matters litigated or litigable.' [Citations.]"

The applicable rule was stated as follows in *Berry* v. *City of Santa Barbara* (1967) 248 Cal.App.2d 438, 445 [56 Cal.Rptr. 553]:

"Collateral estoppel, or estoppel by judgment, is the secondary aspect of res judicata. A final judgment in a prior action between the same parties, or their privies, prevents the relitigation in a subsequent action between them of issues of fact, actually and necessarily litigated and determined between them in the prior action, though the causes of action in the two actions differ. [Citations.]"

In *Hicks* v. *Corbett,* 130 Cal.App.2d 87 [278 P.2d 77], it appeared that appellants had brought an action in the Superior Court of King County, Washington seeking a rescission of written agreements for the exchange of certain real and personal properties of appellants located in Santa Barbara and for other real and personal properties of respondents located in the State of Washington. The Washington court made findings of fact adverse to the appellants and entered judgment against them. Appellants took no appeal from the Washington judgment but some five months later served a notice of rescission of the agreement and filed their complaint in the California action seeking substantially the same relief. Respondents' demurrer to the complaint was sustained without leave to amend.

In affirming the ensuing judgment of dismissal, the Court of Appeal recognized "that the courts of one state cannot make a decree which will operate to change or directly affect the title to real property beyond the territorial limits of the jurisdiction," but pointed out that "The Washington action was an in personam action—the subject matter was the contract of exchange and the rights of the parties thereunder. Certainly the Washington Court had jurisdiction of the parties and of the contract." The concluding paragraph of the opinion is as follows (pp. 90-91):

"Under the full faith and credit clause of the United States Constitution, such a decree of the Washington court must bar a relitigation of the parties'

contractual rights in the California courts. In the respondents' words, 'Appellants chose to litigate this matter in Washington and secured an adverse decree, they were apparently satisfied that this decree was without error for they did not appeal or in any way try to assert or correct any error in the Washington action. Now they would attempt to impose upon the courts of this state and the defendants again by relitigating the identical matter."

■ In the case at bench Sandra appeared and answered the complaint in the Illinois suit. When she sought from the Illinois courts an adjudication in her favor upon the litigated issues of law and fact tendered by the complaint and by her answer and when she actively contested the issues on their merits both in the trial court and in the appellate courts of Illinois, she subjected herself to the jurisdiction of those courts and is bound by their adjudication at least with respect to the issues of fact.

*The Trial Court Erred in Its Finding That There Was No Substantial Difference Between Samuel's California Will and His Illinois Will Made in Compliance With His Agreement With His Predeceased Wife.*

■ The differences between the will made by Samuel in conformity with his agreement and his California will made in violation thereof are so very apparent and so very substantial that the finding under present discussion is truly surprising.

First and of paramount importance is the fact that the California will creates a trust which in effect gives Sandra a life estate in all of the property with the result that appellants' enjoyment of the bequests made in their favor is postponed until after Sandra's death, whereas under the reciprocal will appellants would have received their bequests many years ago. Secondly, aside from and in addition to the $10,000 specific bequest to Sandra, the California will contains liberal provisions for invasions of the principal of the testamentary trust thereby created for her benefit in the event of an insufficiency of income for her support. Thirdly, the California will provides for distribution of the remainder of the estate, if any, after Sandra's death to beneficiaries and in proportions entirely different from those provided for in the reciprocal will.

*The Appeal From the Order Granting Family Allowance.*

As a proximate result of Samuel's violation of his agreement with his predeceased wife by his act in executing the California will, the admission of that will to probate, and the generous family allowances made to Sandra during the past ten years by the orders made in the probate proceedings,

Sandra already has received in excess of $70,000 from the assets of the estate, whereas appellants, the beneficiaries of the reciprocal will agreement, have received nothing.

Immediately after Samuel's death Sandra filed her petition in the California probate proceedings for a family allowance. On February 17, 1961, over the objection of certain of the residuary beneficiaries of Samuel's Illinois will, the court entered its order allowing Sandra the sum of $700 per month, attorney's fees, and a sum not to exceed $1,400 for medical and hospitalization expenses. The award of attorney's fees was ordered by the probate court in the face of California precedents which were called to its attention indicating the impropriety of awarding attorney's fees on a widow's petition for family allowance. (*Estate of Van Der Oef*, 212 Cal. App.2d 155, 158-159 [27 Cal.Rptr. 855]; and *Estate of Bevelle*, 81 Cal. App.2d 720 [185 P.2d 90].)

With remarkable generosity the probate court made orders granting Sandra's annual petitions for family allowance for the years 1961 through 1969.[1] No appeal was taken from any of these eight prior orders. As of July 10, 1969, Sandra had received payments out of the estate in an aggregate amount exceeding $66,000. As of that date the estate had been depleted to the point that there remained therein less than $60,000.

On June 19, 1969, Sandra again petitioned for family allowance. Objections were again filed by appellants, the beneficiaries under the reciprocal Illinois will. The objectors pointed out that by virtue of the conclusion of the litigation in Illinois and the final judgment entered therein, the California court was bound by the doctrine of collateral estoppel to find that the balance of the estate in the hands of the executor belonged to the objectors. Appellants argued that in practical effect the estate was insolvent and that no further allowance should be granted.

---

[1] September 8, 1961—allowed $600 per month from July 1, 1961 through May 1962.

June 25, 1962—allowed $850 for the month of June 1962 and $600 per month for the next eleven months, plus the sum of $1,200 for dental expenses.

August 19, 1963—allowed $850 for the month of July 1963 and $600 per month for the next eleven months.

July 28, 1964—allowed $850 for the month of July 1964 and $600 per month for the next five months.

February 23, 1965—allowed $625 per month for the month of January 1965 and for the next eleven months.

January 25, 1966—allowed $625 per month for the month of January 1966 and for the next eleven months.

July 28, 1967—allowed $1,180 for the month of July 1967 and $680 per month for the next eleven months.

October 15, 1968—allowed $1,025 for the month of July 1968 and $675 per month for the next eleven months.

On September 8, 1969, the court overruled the objections and granted the petition for family allowance, allowing $1,050 for the month of July 1969, and the sum of $750 per month for the next succeeding eleven months. The instant appeal is from that order.

Probate Code section 680 provides in pertinent part as follows: "The widow . . . [is] entitled to such reasonable allowance out of the estate as shall be necessary for [her] maintenance . . . during the progress of the settlement of the estate, which, in case of an insolvent estate, must not continue longer than one year after granting letters."

In *Estate of Murphy*, 225 Cal.App.2d 224 [37 Cal.Rptr. 205], the court was presented with substantially the same question as that which is determinative in the case at bench. There, as in the instant case, there was a dispute as to the ownership of the property constituting the assets of the estate. The objector in *Estate of Murphy* contended that because of the adverse claim to the assets of the estate, the estate was insolvent within the meaning of Probate Code section 680.

The following from the *Murphy* decision at pages 236-238 is particularly apposite in the case at bench. "The question presented is of first impression. While insolvency in its usual concept and definition has reference to the inability to pay debts or to the insufficiency to discharge all enforceable debts . . . it is obvious that an estate without *any* assets is not a solvent estate. The difficulty presented in the situation confronting us, however, is the ascertainment of whether the Murphy estate has any assets. The very existence of such assets as property of the estate is uncertain and contingent upon the outcome of the superior court action. An adjudication in favor of the Murphy estate renders it solvent, while one in favor of the Bank would have the effect of making the estate insolvent.

"Within the meaning of probate law, one who claims as his own, adversely to an estate, specific property held and claimed by an estate is not a creditor of the estate (*Estate of Dutard*, 147 Cal. 253, 256 [81 P. 519]; *Estate of Wilson*, 114 Cal.App.2d 468, 471 [250 P.2d 266]); nor is he a 'person interested in the estate.' (*Estate of Dabney*, 37 Cal.2d 672, 674 [234 P.2d 962].) Should such a claimant, however, be placed in a less favorable position with respect to the provisions of section 680 of the Probate Code than a creditor of the estate? We think not. It appears unreasonable to us that a creditor of an estate should be able to limit the payment of family allowance to one year from the issuance of letters in an insolvent estate and that this right should be denied to one who is claiming the assets of the estate as his own. The inequity of the situation is apparent when we consider that the creditor is seeking to enforce his

claim against *the property of the decedent;* and while his claim is subordinate to the allowance paid during the one-year period, the payments are not made from his assets. The person claiming adversely to the estate, on the other hand, upon establishing the validity of his claim, finds that *his* assets have been depreciated to the extent of the family allowance. To permit the payment of such allowance until his claim is fully litigated could result in a substantial diminution of the assets which ultimately are determined to be his property. . . .

"Turning to the problem posed by the instant case, we are satisfied that it, too, is one resting in the exercise of judicial discretion. Analogizing the question here presented to the precedents cited, and equating it to the intent and purpose of section 680 of the Probate Code, we are satisfied that a probate court is empowered, in the exercise of judicial discretion, to terminate a family allowance after it has continued one year after the granting of letters, upon a showing that there is a reasonable probability that the estate will be rendered insolvent because of pending litigation wherein the assets of the estate are claimed to be the property of another."

The parallel to the instant case is striking for here we have appellants who claim adversely to the Cates estate in an action against Sandra and the estate for quasi-specific performance of an enforceable contract made by decedent Samuel Cates. Appellant's claim is based upon a cause of action which accrued when decedent breached his contract with his first wife. *Brewer* v. *Simpson, supra,* 53 Cal.2d 576, protected such an interest by imposing a constructive trust upon the assets in the hands of the surviving party to a reciprocal will contract stating: "neither [party to the reciprocal will contract] could, after the death of the other, change the . . . named beneficiaries or in any way deprive them of the benefits of said agreement."

Thus, the claim of appellants herein is almost exactly the same in character as that of the objector in the *Murphy* case. Regarding such adverse claims, the *Murphy* court reasoned that: "The person claiming adversely to the estate, on the other hand, upon establishing the validity of his claim, finds that *his* assets have been depreciated to the extent of the family allowance. To permit the payment of such allowance until his claim is fully litigated could result in a substantial diminution of the assets which ultimately are determined to be his property." The application of this language in the instant case is entirely clear.

Indeed, in *Murphy* the adverse claim of the objector had not been finally adjudicated when the order terminating the family allowance was made. The finding in *Murphy* was that the estate was "probably" insolvent by virtue of the pending claim. Since the validity and enforceability

of appellant's claim to all of the remaining assets of the Estate of Cates had been established by the final judgment of the Illinois court, the order granting family allowance here under review was not merely an abuse of discretion but it was made in violation of section 680 of the Probate Code.

## Conclusion

Weighing the equities which accrued to Sandra as the result of her eleven months of marriage to the decedent against the rights of his predeceased wife of thirty-eight years, in whose place appellants stand, we conclude that the scales of justice in this case have been thrown out of balance by the generous orders for family allowance under which Sandra had received an aggregate of more than $66,000 at the time the order now under review was made. In whatever manner the equities claimed by respondent be characterized, her compensation has been more than adequate.

The judgment under review is reversed and the trial court is directed to enter judgment for appellants in conformity with the views expressed in the foregoing opinion. The order presented for review is reversed with directions to the trial court to enter an order denying the petition for family allowance.

Roth, P. J., and Fleming, J., concurred.

A petition for a rehearing was denied April 14, 1971, and the judgment was modified to read as printed above.